**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| 3M COMPANY, a Delaware Corporation, and 3M INNOVATIVE PROPERTIES COMPANY, a Delaware Corporation, | ) ) ) ) |
| Plaintiffs/Counterclaim-Defendants, | ) ) |
| v. | ) ) |
| CONTINENTAL DIAMOND TOOL CORP., an Indiana Corporation, PAUL CHRISTY, an individual, TIMOTHY KEENE, an individual, and CHAD WESNER, an individual, | ) ) ) ) ) ) |
| Defendants/Counterclaim-Plaintiffs. | ) |

Cause No. 1:21-CV-274-HAB

**OPINION AND ORDER**

This case began as a routine suit for breach of a noncompete provision in an employment contract. But to raise the price of poker, Defendants have counterclaimed alleging a litany of offenses, many related to Plaintiffs' egregious act of failing to shut down the email and voicemail accounts of former employees Paul Christy ("Christy"), Timothy Keene ("Keene"), and Chad Wesner ("Wesner") (collectively "Individual Defendants"). Plaintiffs moved to dismiss the counterclaim (ECF No. 37) and spirited briefing ensued (ECF Nos. 39, 42, 47). The motion to dismiss is now ripe for adjudication.

**I.     Factual Background**

The Individual Defendants are all former employees of Plaintiffs. Each left that employment (voluntarily or involuntarily) and went to work for Continental Diamond Tool Corp. ("CDTC"). Plaintiffs maintained the Individual Defendants' email and voicemail accounts even after they left Plaintiffs' employ.

Christy alleges that his employment agreement with Plaintiffs contained a provision allowing him to work for CDTC if he obtained Plaintiffs' consent. Christy sought that consent but alleges that Plaintiffs failed to respond within a reasonable time. Instead, Plaintiffs waited more than two months to object to Christy's new employment.

Wesner alleges that his employment agreement required Plaintiffs to pay him "leave" if it objected to him taking other employment. Wesner requested Plaintiffs' consent to join CDTC, but Plaintiffs declined. Despite withholding their consent, Plaintiffs did not pay leave as required by the agreement. Rather, Plaintiffs continued to use Wesner's service even after his job with Plaintiffs had ended.

Keene was terminated by Plaintiffs for reasons unrelated to his performance. He sought, and was granted, Plaintiffs' consent to go to work for CDTC.

Based on these facts, Defendants alleged these causes of action: two counts of interference with business relationships related to Christy and Wesner's employment with CDTC; a count requesting a declaration that Plaintiffs' employment agreements are overbroad and unenforceable; a violation of 42 Pa. Cons. Stat. § 8316 for Keene and Christy; a violation of Fla. St. Ann. § 540.08 for Wesner; a violation of the Lanham Act on behalf of the Individual Defendants; and a count of unfair competition on behalf of CDTC.

## II.     Legal Discussion

### A.     *Motion to Dismiss Standard*

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal if the complaint fails to set forth a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). Thus, when analyzing a Rule 12(b)(6) motion to dismiss, a court construes the

claim in the light most favorable to the plaintiff, accepts all factual allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

At a minimum, the claim must give fair notice of what the claim is and the grounds on which it rests; and the factual allegations must raise a right to relief above the speculative level. *See Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602-03 (7th Cir. 2009); *Tamayo*, 526 F.3d at 1081, 1083. While a claim need not include detailed factual allegations, a plaintiff has the obligation to provide the factual grounds supporting his entitlement to relief; and neither bare legal conclusions nor a formulaic recitation of the elements of a cause of action will suffice in meeting this obligation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the pleading standard Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and "(t)hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). Although this does not require heightened fact pleading of specifics, it does require the claim to contain enough facts to state a claim to relief plausible on its face. *Bell Atl. Corp.*, 550 U.S. at 570; *Tamayo*, 526 F.3d at 1083 ("(a) plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible rather than merely speculative, that he is entitled to relief").

**B.**  *The Lanham Act*

Being a federal court, the Court will address the federal claim first. Civil violations of the Lanham Act are governed by 15 U.S.C. § 1125(a). That section provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
>> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). The Supreme Court has interpreted the Act as creating two distinct bases of liability: false association under subsection (A); and false advertising under subsection (B). *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

The counterclaim does not limit itself to one basis of liability, and the parties discuss both bases in their briefs. The Court will address each in turn.

**1.**     *The Counterclaim Does Not State a Claim for False Advertising*

To survive a motion to dismiss a claim for false advertising under the Lanham Act, Defendants must plausibly allege that Plaintiffs made "a material false statement of fact in a commercial advertisement and that the false statement deceived or had a tendency to deceive a substantial segment of its audience." *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 934 (N.D. Ill. 2016) (citing *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007)). The parties debate each element of a false advertising claim, but the Court finds that the counterclaim fails to plausibly allege the existence of a commercial advertisement.

The Lanham Act does not define commercial advertising or promotion. Yet the Seventh Circuit has provided some guideposts for district courts to use. As a starting point, the statutory concept "commercial advertising or promotion" is broader than classic advertising, and it is not limited to traditionally published or broadcast materials. *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514,

4

521-22 (7th Cir. 2012). "Advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication. In normal usage, an advertisement read by millions (or even thousands in a trade magazine) is advertising." *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001). Individualized person-to-person communication, whether conducted in-person or through correspondence, is not within the scope of the statute. *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) (person-to-person communications at trade shows is not commercial advertising or promotion); *ISI Int'l, Inc. v. Borden Ladner Gervais, LLP*, 316 F.3d 731, 733 (7th Cir. 2003) (letters sent by a law firm to a company's business partners warning them not to use the company's products is not commercial advertisement or promotion). Stated succinctly, "advertising is a subset of persuasion and refers to dissemination of prefabricated promotional material." *Zurich Ins. Co. v. Amcor Sunclipse N.A.*, 241 F.3d 605, 607 (7th Cir. 2001).

That said, a classic advertising campaign is not the only form of marketing embraced by "commercial advertising or promotion." *Neuros*, 698 F.3d at 522. *Neuros* teaches that "there are industries in which promotion—a systematic communicative endeavor to persuade possible customers to buy the seller's product—takes a form other than publishing or broadcasting." *Id*. It is possible, then, that in some contexts a face-to-face or individualized communication could qualify as promotion.

This is not one of those contexts. Nothing in the counterclaim alleges the "dissemination of prefabricated promotional material" or "a systematic endeavor to persuade possible customers." Instead, Plaintiffs' sin seems to be one of omission: it failed to scrub the Individual Defendants' electronic existences in what those Defendants considered to be an acceptable period. The Court

finds no authority for the position that this kind of inaction can constitute false advertising and Defendants point to none.

Perhaps some segment of the market the parties serve was confused by Plaintiffs' inaction. The Court can conceive of a situation in which a customer calls what they believe to be one of the Individual Defendants' phone numbers and gets a message suggesting that person is still employed by Plaintiffs. Indeed, Defendants allege that at least one customer tried to contact Keene at his previous email address. But these circumstances do not involve Plaintiffs advertising or promoting the Individual Defendants as employees. Rather, the only actor here is the customer; any misleading information is then conveyed as a matter of computer programming. An argument that customer action can constitute false advertising by Plaintiffs strikes the Court as the exact opposite of what the statute intends to punish. Without some allegation that Plaintiffs continued to distribute the Individual Defendants' phone numbers or email addresses to their customers after the employment separation, the Court finds no basis for a false advertising claim in the counterclaim.

**2.**   *The Counterclaim Does Not State a Claim for False Endorsement*

Under the Lanham Act's "false designation" provision, no entity can use "any false designation of origin" of its goods that is "likely to cause confusion, or to cause mistake, or to deceive" as to (1) "affiliation, connection, or association" with another entity or (2) "origin, sponsorship, or approval" of its goods by another entity. 15 U.S.C. § 1125(a)(1)(A); *see also Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F. Supp. 918, 928 (C.D. Cal. 1996) (to succeed on a false designation of origin claim, a plaintiff must prove, among other things, "the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another

person") (citing 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.03 [1] [a]).

This section of the Lanham Act requires that customers likely be, in other words, tricked into thinking that products are affiliated with or approved by another party. *See Syngenta Seeds, Inc. v. Delta Cotton Co-op., Inc.*, 457 F.3d 1269, 1277 (Fed. Cir. 2006) (to state a plausible claim under § 1125(a)(1)(A), a plaintiff must allege, among other things, "that the false designation of origin was likely to cause consumer confusion" as to who produced a good). To prevail on this type of claim, the Individual Defendants must be able to show (1) that their mark is protectable, and (2) that Plaintiffs use of that mark is likely to cause confusion among consumers. *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016).

In the context of false endorsement claims—which is how the Court reads the counterclaims—the "mark" at issue is the Individual Defendants' identity. *ETW Corp. v. Jireh Pub, Inc.*, 332 F.3d 915, 926 (6th Cir. 2003). False endorsement occurs when an individual's identity is connected with a product or service in such a way that consumers are likely to be misled about the individual's sponsorship or approval of the product or service. *See, e.g.*, *Wendt v. Host Int'l, Inc*., 125 F.3d 806 (9th Cir. 1997)(animatronic robotic figures resembling actors in Cheers television program used to advertise chain of airport bars modeled on Cheers set); *Abdul–Jabbar v. General Motors Corp*., 85 F.3d 407 (9th Cir. 1996)(athlete's name and accomplishments used in television advertisement for Oldsmobile automobiles); *Waits v. Frito–Lay, Inc*., 978 F.2d 1093 (9th Cir. 1992)(imitation of singer's unique voice used in radio commercial advertising Dorito Chips); *White v. Samsung Electronics America, Inc*., 971 F.2d 1395 (9th Cir. 1992)(female robot bearing resemblance to television celebrity, Vanna White, turning letters in what looked like the "Wheel of Fortune" game show set in television commercial advertising electronics products);

*Allen v. National Video, Inc.*, 610 F. Supp. 612 (S.D.N.Y. 1985)(photograph of Woody Allen look-alike in national advertising campaign for video club). While these cases generally involve celebrities they need not, particularly where the individual alleging false endorsement has notoriety among a subset of the population. *See Hauf v. Life Extension Found.*, 547 F. Supp. 2d 771, 777 (W.D. Mich 2008).

Individual Defendants focus their briefing on the assertion that their names have protectible, commercial value. (ECF No. 42 at 3-4). But even if true, the Court finds that the counterclaim fails to state a claim for false origin or false endorsement. *Mktg. Prods. Mgmt., LLC v. Healthandbeautydirect.com. Inc.*, 333 F. Supp. 2d 418 (D. Md. 2004), is instructive. There, the parties executed an agreement to market a bicycle via infomercials. During the term of the agreement, Chris Lundin ("Lundin"), a member of the bicycle's design team and a principle of the plaintiff, took part in the filming. After twelve months the agreement expired by its terms, and Lundin stopped being compensated for sales of the bicycle. Even so, the defendant continued to run the infomercial featuring Lundin, and ignored Lundin's repeated requests to take the infomercial off the air. Lundin sued under the Lanham Act, claiming that the "*present broadcast* of a *past endorsement* [was] allegedly 'likely to confuse customers' as to Lundin's *continued endorsement* of the [bicycle]." *Id.* at 429-30 (original emphasis).

The district court held that these allegations did not state a claim under the Lanham Act.

Manifestly, this case bears no resemblance to those leading cases in which courts upheld false endorsement claims. In those cases, the facts generally involved depictions of or statements attributed to well-known individuals who in fact were in no way associated with the defendant's product. *See, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) (recognizing claim under section 43(a) where uniform worn by star of X-rated movie was confusingly similar to plaintiff Dallas Cowboy Cheerleaders' trademark uniforms, falsely creating the impression that plaintiffs "sponsored or otherwise approved the use" of the uniform); *Allen v. Men's World Outlet, Inc.*, 679 F. Supp. 360, 368 (S.D.N.Y. 1988) (celebrity stated a claim under section 43(a) by showing

that advertisement featuring photograph of a look-alike falsely represented that advertised products were associated with him); *Chicago Lawyer, Ltd. v. Forty– Sixth Ward Regular Democratic Organization*, 220 U.S.P.Q. 511, 1982 WL 1283 (N.D.Ill. Sept. 17, 1982) (plaintiff publisher had cause of action under Lanham Act where the defendant, a democratic precinct captain, reprinted excerpts from plaintiff's publication so as to falsely imply plaintiff's endorsement and sponsorship of defendant's candidates); *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.*, 681 F.2d 397 (5th Cir. 1982) (Better Business Bureau had Lanham Act claim when weight reduction center used its name in its advertising, falsely implying that its program was endorsed by the Better Business Bureau).

*Id*. at 431. Instead, the district court found that Lundin was trying to impose, via federal law, a limitation on the use of his likeness that he had not negotiated.

In essence, plaintiffs seek to have the court *imply* under the Lanham Act a cause of action that would permit one who *donated* his image for commercial purposes in electronic media *without an agreement containing conditions or limitations* as to such use, to have the court *create or impose such an agreement where one does not exist*, regulating the truthful use by a defendant of the plaintiff's *donated* image which defendant preserved in such electronic media. In other words, plaintiffs' Lanham Act claim rests entirely on the extraordinary assertion that Lundin had a "reasonable expectation [which, although he did not protect it by contract, he is entitled to have the courts protect as a matter of federal law] that his likeness would only be used as long as he was employed and compensated as an [HBD consultant] pursuant to the Agreement." Comp. ¶ 47 (alterations added). I can discern no basis in law for implying such a cause of action, however. To the contrary, in respect to a sale of trademarked goods, federal law is precisely to the contrary. *Shell Oil Co. v. Commercial Petroleum, Inc*., 928 F.2d 104, 107 (4th Cir. 1991) ("As a general rule, trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent. *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir.), cert. denied, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987)."); *see also John Paul Mitchell Systems v. Pete–N–Larry's, Inc.*, 862 F.Supp. 1020, 1023 (W.D.N.Y. 1994) ("Of course, the mere fact that the sale is unauthorized—that is, without consent—does not give rise to an infringement claim when the marked goods are genuine. *See H.L. Hayden Co. of N.Y. v. Siemens Medical Systems*, 879 F.2d 1005, 1023 (2d Cir. 1989) ('the unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation').").

*Id*. at 432-33 (original emphasis). While state privacy laws may provide more protection, the district court held, the Lanham Act does not provide a claim for someone who objects to the continued, unauthorized use of their image. *Id*. at 433.

The Court finds that the logic of *Mkgt. Prods.* applies. While the Individual Defendants are no longer employed by Plaintiffs, they were. The subject email and voicemail accounts were created during that employment. Any attribution or endorsement, then, was true when made. *See Dryer v. National Football League*, 55 F. Supp. 3d 1181 (D. Minn. 2014) (no Lanham Act claim where players were affiliated with league when footage was shot).

Moreover, despite a three-page employment agreement covering the period both during and after the Individual Defendants' employment with Plaintiffs, there is no provision addressing the ongoing use of the Individual Defendants' likenesses. Just as in *Mkgt. Prods.*, the Court is not going to imply such an agreement or create a Lanham Act claim for a violation of the implied agreement. The allegations in the counterclaim do not state a claim under the Lanham Act, and the claims under the Act will be dismissed.

**C.**   ***Keene and Christy's Counterclaim Fails to State a Claim under Pennsylvania's Right to Publicity Statute***

Individual Defendants next allege that Plaintiffs' maintenance of Keene and Christy's email and voicemail accounts violates 42 Pa. Cons. Stat. § 8316. That statute provides, in pertinent part:

> Any natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose without the written consent of such natural person or the written consent of any of the parties authorized in subsection (b) may bring an action to enjoin such unauthorized use and to recover damages for any loss or injuries sustained by such use.

42 Pa. Cons. Stat. § 8316(a). The elements of the claim are "(1) the plaintiff must be a natural person; (2) their name or likeness must have commercial value; (3) another person must have used their name or likeness for a commercial or advertising purpose; and (4) that other person must have lacked proper authorization to use the name or likeness in the manner it was used." *Buckley*

10

*v. Universal Sewing Supply, Inc.*, 2020 WL 7240978, at \*4 (M.D. Penn. Dec. 9, 2020). The statute is the "Pennsylvania corollary" to the "Lanham Act." *Id.*

The Pennsylvania Act defines "commercial or advertising purpose," thereby limiting its scope. The term includes "the public use or holding out of a natural person's name or likeness: (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, services or business; (ii) for the purpose of advertising or promoting products, merchandise, goods or service of a business; or (iii) for the purpose of fundraising." 42 Pa. Cons. Stat. § 8316(d)(1). The use of a name or likeness, authorized or not, does not violate the statute if it is used in a manner outside of this definition.

The issue faced by the Court is the relative lack of interpreting decisions explaining the elements of a statutory claim. The cases the Court has found apply the statute in the way one would expect: unauthorized use of a name or likeness in an outward attempt to sell products or services. *See*, *e.g.*, *Hinton v. Sansom St., Inc.*, 2021 WL 1313107 (E.D. Penn. Apr. 7, 2021) (images of "well-known" models used in advertisements and promotional materials for swingers clubs); *Cornette v. Graver*, 473 F. Supp. 3d 437 (W.D. Penn. 2020) (selling t-shirts featuring the likeness of a wrestling commentator); *AFL Philadelphia LLC v. Krause*, 639 F. Supp. 2d 512 (E.D. Penn. 2009) (season ticket emails containing unauthorized signature). The Court finds no cases in which liability under the Pennsylvania statute has been based on mere maintaining email and voicemail accounts.

The closest factual situation the Court can find, and it's not that close, is *Kelly v. Peerstar LLC*, 2020 WL 5077940 (W.D. Penn. 2020). There, two doctors sued under the Pennsylvania statute after their names were forged on insurance reimbursement forms. The district court quickly

rejected the claim, finding that, although financial gain stemmed from the forgeries, the names were not held out publicly for the sale or promotion of a product. *Id*. at \*10.

Individual Defendants claim that they have alleged a commercial or advertising purpose because "3M continues to hold Keene and Christy out as employees because 3M receives a benefit from that association." (ECF No. 42 at 12). The Court assumes, as it must, that this is true. But as *Kelly* teaches, receiving a benefit from the use of a name is not enough to violate the statute.

What the weight of the authority interpreting § 8316 teaches is that, for a likeness to be used in a commercial or advertising purpose, there must be some public-facing commercial use of the likeness. That is, the likeness must be distributed to members of the public in a way calculated to bring in money. There are no allegations of such use here. Individual Defendants do not allege that Plaintiffs continued to publish their email addresses or telephone numbers after they left Plaintiffs' employment. Individual Defendants do not allege that this information was distributed at all. Instead, the allegation is that Plaintiffs continued to house the email and voicemail accounts internally. The Court finds no support for the idea that this conduct violates § 8316, so Individual Defendants' claim under the statute will be dismissed.

**D.    *Wesner's Counterclaim Fails to State a Claim under Florida's Commercial Misappropriation Statute***

Like Keene and Christy's claims under Pennsylvania law, Wesner has asserted a claim under Fla. Stat. Ann. § 540.08, Florida's commercial misappropriation statute. That statute provides, in relevant part:

> No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without . . . express written or oral consent.

Fla. Stat. Ann. § 540.08(1). Like Keene and Christy, Wesner claims that the statute was violated when Plaintiffs maintained his email and voicemail accounts after he was no longer employed by Plaintiffs.

Section 540.08 does not have a statutory definition of "commercial or advertising purpose," but it does have ample case law interpreting the phrase. That case law holds that the statute is violated only when the name or likeness is used to "directly promote a product or service." *See Valentine v. CBS, Inc*., 698 F.2d 430, 433 (11th Cir. 1983) (recognizing that the proper interpretation of Fla. Stat. § 540.08 requires the plaintiff to prove that the defendants used a name or likeness to directly promote a product or service); *Tyne v. Time Warner Entm't Co., L.P*., 204 F.Supp. 2d 1338 (M.D. Fla. 2002) (recognizing that Fla. Stat. § 540.08 only prohibits the use of a name or image when such use directly promotes a commercial product or service); *Epic Metals Corp. v. CONDEC, Inc*., 867 F. Supp. 1009, 1016 (M.D. Fla. 1994) ("Florida Statute § 540.08 prevents the unauthorized use of a name or personality to directly promote the product or service of the publisher."); *Nat'l Football League v. The Alley, Inc*., 624 F. Supp. 6, 7 (S.D. Fla. 1983) ("Section 540.08 of the Florida Statutes prohibit unconsented use of an individual's name and likeness only when such directly promotes a commercial product or service"); *Loft v. Fuller*, 408 So.2d 619, 622 (Fla. 4th DCA 1981) ("In our view, Section 540.08, by prohibiting the use of one's name or likeness for trade, commercial, or advertising purposes, is designed to prevent the unauthorized use of a name to directly promote the product or service of the publisher").

To draw Plaintiffs' conduct within this standard, Wesner cites *John Daly Enters., LLC v. Hippo Golf Co., Inc.*, 646 F. Supp. 2d 1347 (S.D. Fla. 2009). There, the defendant, a golf club manufacturer, was found liable under § 540.08 to golfer John Daly, a former spokesman for the

company. The basis for that liability was a photo of Daly on the defendant's website with the following caption:

> The twice major winner and golfing superstar, John Daly, will continue to be synonomous [sic] with Hippo. Renowned as the longest hitter in the professional game, Daly truly had the power of Hippo behind his game, working closely with the Hippo design teams over the years to produce some of the most technologically advanced woods to hit the golf market.

*Id*. at 1351. The district court found this to be "a commercial exploitation of Daly's name and likeness to promote Defendant's golf equipment." *Id*.

Wesner claims, incredibly, that "there is no meaningful distinction between the golf company holding out Daly as synonymous with the golf company and 3M continuing to maintain Wesner's 3M voicemail and email." (ECF No. 42). To the contrary, there are *lots* of meaningful distinctions between this case and *Daly*. There is no allegation that Wesner's name or likeness appear on Plaintiffs' commercial website. There is no allegation that Wesner's name or likeness were put front and center as part of a marketing campaign to sell Plaintiffs' products. There is no allegation that Plaintiffs have expressly stated that Wesner "will continue to be synonymous" with Plaintiffs. The Court would be so bold to say that there is no meaningful similarity between Wesner and Daly.

Again, nothing in the counterclaim alleges facts that would fall within § 540.08's definition of commercial or advertising purposes. There are no allegations that Plaintiffs used Wesner's email or voicemail accounts to "directly promote a product or service." Instead, those accounts remained live but dormant. Without allegations of direct promotion, Wesner's claim under § 540.08 must be dismissed.

14

**E.**    *Defendants' Request for Declaratory Judgment will be Dismissed*

Count III of the counterclaim seeks a declaration that Plaintiffs' employee agreements are overbroad, do not seek to protect a legitimate protectible interest, are not supported by adequate consideration, and are not enforceable. (ECF No. 35 at 37). Plaintiffs have moved to dismiss this Count, claiming that the "enforceability of the 3M Employment Agreement will be determined, at a minimum, by either party's tortious interference with contract/business relationship claims or by Plaintiff's [sic] breach of contract claim." (ECF No. 38 at 25).

In deciding whether to issue a declaration, the Court must be mindful of the Declaratory Judgment Act's purpose. A declaration should "clarify and settle the legal relations at issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc*., 819 F.2d 746, 749 (7th Cir. 1987) (citation omitted). This act contemplates two scenarios: when "(1) [t]he controversy has ripened to a point where one of the parties could invoke a coercive remedy (i.e. a suit for damages or an injunction) but has not done so; and (2) [a]lthough the controversy is real and immediate, it has not ripened to such a point, and it would be unfair or inefficient to require the parties to wait for a decision." *Id*. This case falls into neither scenario, as a coercive action related to the enforceability of the agreements has been filed.

This does not mean the Court cannot hear the declaratory judgment claim. Rather, the Court must consider these factors to decide whether it should still hear the declaratory suit: "(1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for *res judicata*'; (4) whether the use of a declaratory action would increase friction between our

15

federal and state courts and improperly encroach on state jurisdiction, and (5) whether there is an alternative remedy that is better or more effective." *NUCOR Corp. v. Aceros Y Maquilas de Occidente.*, 28 F.3d 572, 579 (7th Cir. 1994) (citing *Nationwide Mut. Fire Ins. Co. v. Willenbrink*, 924 F.2d 104, 105 (6th Cir. 1991)).

The Court finds the first factor determinative. Whether the employment contracts are enforceable will be decided by Plaintiffs' breach of contract claim. Defendants challenge this statement, claiming that "there are many different ways this case can be resolved without ever determining whether the Employment Agreements are enforceable at all," noting that Plaintiffs could be found to be in first breach. (ECF No. 42 at 24). Defendants are partially correct. There are permutations of this litigation that could lead to the case being resolved without a determination of whether aspects of the agreements are enforceable. But if this case is resolved on the merits there will be a determination as to whether *these* agreements are enforceable as to *these* parties.

If Defendants want a declaration so that they can resolve future disputes ("CDT would like to have the enforceability of these agreements to be fully and finally decided and not have to face any more lawsuits from 3M") (ECF No. 42 at 24-25), that desire lacks the definiteness, reality, and immediacy needed to exercise jurisdiction. The phrase "case of actual controversy" within the Declaratory Judgment Act refers to those types of "Cases" or "Controversies" that are justiciable under Article III of the Constitution. See *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937). Disputes must be "definite and concrete, touching the legal relations of parties having adverse legal interests," and they must be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 549 U.S. at 127 (quoting *Aetna Life*, 300 U.S. at 240-41). "Basically, the question in

16

each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co*., 312 U.S. 270, 273 (1941).

The specter of future disagreements between CDT and Plaintiffs over employees is neither real nor immediate. As Judge Leichty sagely stated, "[t]he Declaratory Judgment Act is not meant to keep the court 'on retainer' to answer questions that may hypothetically come up. Issues for declaration must be ripe, and the possibility of future issues such as these aren't ripe." *Ray v. Raj Revocable Tr.*, --- F. Supp. 3d ---, 2020 WL 1184755, at *11 (N.D. Ind. Mar. 11, 2020). If Defendants want future disputes resolved, they can litigate them when they arise.

Unlike abstention doctrines, "district courts possess significant discretion to dismiss or stay claims seeking declaratory relief, even though they have subject matter jurisdiction over such claims." *Envision Healthcare, Inc. v. PreferredOne Ins. Co*., 604 F.3d 983, 986 (7th Cir. 2010). Because the Court finds no reason to try a declaratory judgment case that addresses the same subject matter as the breach of contract claims, the Court declines to exercise that discretion here. The declaratory judgment count will be dismissed.

**F.**      ***Minnesota Law Applies to the Unfair Competition Claim, and it Must be Dismissed***

Next, the parties disagree about what law to apply to CDTC's claim for unfair competition. Plaintiffs, after reviewing Indiana's choice of law rules, conclude that Minnesota law should apply. Defendants, on the other hand, simply declare that Indiana law applies. The Court agrees with Plaintiffs.

A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Jean v. Dugan*, 20 F.3d 255, 260

(7th Cir. 1994). The Erie doctrine extends to choice of law principles and requires the court to apply the conflicts rules of the forum state. *Id*. (citing *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496–97 (1941)). This Court, then, must apply Indiana's choice of law rules.

"[B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Barron v. Ford Motor Co. of Canada Ltd*., 965 F.2d 195, 197 (7th Cir. 1992). If the purposes and policies of two potential rules are the same, the forum should apply the forum law. *Lutz v. DeMars*, 559 N.E.2d 1194, 1196 n. 1 (Ind. Ct. App. 1990). Here, the parties agree that there are significant differences between Minnesota and Indiana law that affect the outcome of CDTC's unfair competition claim. Plaintiffs argue that Minnesota doesn't recognize such a claim while Indiana does. Thus, a choice of law ruling is required.

For tort cases, "the presumption is that the traditional *lex loci delicti* rule—the place of the wrong—will apply. Under this rule, the trial court applies the substantive law of 'the state where the last event necessary to make an actor liable for the alleged wrong takes place.'" *Alli v. Eli Lilly and Co.*, 854 N.E.2d 372, 376 (Ind. Ct. App. 2006) (quoting *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004)).

> However, this presumption is not conclusive. It may be overcome if the trial court is persuaded that the place of the tort bears little connection to this legal action. If the location of the tort is insignificant to the action, the trial court should consider other contacts that may be more relevant, such as: 1) the place where the conduct causing the injury occurred; 2) the residence or place of business of the parties; and 3) the place where the relationship is centered. These factors are not an exclusive list, nor are they necessarily relevant in every case. All contacts should be evaluated according to their relative importance to the particular issues being litigated. This evaluation ought to focus on the essential elements of the whole cause of action rather than on the issues one party or the other forecasts will be the most hotly contested given the anticipated proofs.

*Id*. (quotes and citations omitted).

18

Generally, the last event necessary to make an actor liable in a tort case is the injury. *Id.* at 378 (collecting cases). Because Indiana law requires a showing of injury and damages to maintain an unfair competition claim, *see Hammons Mobile Homes, Inc. v. Laser Mobile Home Transp., Inc.*, 501 N.E.2d 458, 462 (Ind. Ct. App. 1986), the general rule applies here. The place of the wrong, then, is Indiana.

That said, the Court finds little connection between this legal action and Indiana. CDTC is headquartered in Indiana, but it markets its products worldwide[1]. *See* About CDT, https://www.cdtusa.net/about (last visited June 28, 2022) ("Continental Diamond Tool is a leading producer in the global market for superabrasive grinding wheels and custom tooling."). The alleged unfair competition is just as likely to affect customers in India or Indianola as Indiana. Case in point—none of the Individual Defendants reside in, or even near, Indiana. All this is to say that, while any unfair competition may be recorded on the bottom line of an Indiana company, Indiana is far from the locus of the alleged conduct. *See, e.g., Advanced Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (allegation that misleading emails could harm an Indiana company found insufficient to establish minimum contacts for jurisdictional purposes).

Weighing the relevant factors, the Court finds that Minnesota is more closely related to the essential elements of the case than Indiana. The alleged conduct causing the injury, maintaining the email and voicemail accounts, occurred in Minnesota. When Keene allegedly called Plaintiffs to request that his email and voicemail accounts be shut off, he called Peter Eisenberg, an employee of Plaintiff in Minnesota. (ECF No. 35 at 33; ECF No. 35-10 at 1). The conduct giving rise to the claim, then, was confined to Minnesota.

---

[1] For instance, Wesner's job at CDTC is "Technical Support for the sales team in Mexico and Canada." (ECF No. 35-6 at 4).

The residence of the parties is of no help. The parties are in Minnesota, Indiana, Pennsylvania, and Florida. Nor does there appear to be a "relationship" here that is relevant for choice of law purposes. The three factors in *Alli*, then, point to the application of Minnesota law.

The only connection to Indiana is the headquarters of one Defendant (out of four). The acts allegedly constituting unfair competition did not occur in Indiana, nor were they mainly directed toward Indiana. There are no allegations of Indiana consumers being misled or confused by Plaintiffs' conduct. The Court finds that the location of CDTC's corporate offices, alone, does not compel the application of Indiana law. Thus, Minnesota law will apply.[2]

Under Minnesota law, "[u]nfair competition is not a tort with specific elements; it describes a general category of torts which courts recognize for the protection of commercial interests." *Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 305–306 (Minn. Ct. App. 1987). Torts included within this general category are product disparagement, *Advanced Training Systems, Inc. v. Caswell Equipment Company, Inc*., 352 N.W.2d 1 (Minn. 1984), tortious interference with contractual interests and improper use of trade secrets. *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628 (Minn. 1982). For a claim to survive dismissal, it must identify the tort that is the basis for the unfair competition claim. *Zimmerman Grp., Inc. v. Fairmont Foods of Minn., Inc.*, 882 F. Supp. 892, 895 (D. Minn. 1994). Because CDTC has alleged only a general category of torts rather than a specific cause of action, its unfair competition claim will be dismissed.

---

[2] The Court would likely conclude, for the same reasons, that Minnesota law applied to Defendants' tortious interference with contract claims. But Plaintiffs have not raised the choice of law issue as to that claim, so it has been waived. *Ward v. Soo Line R.R. Co.*, 901 F.3d 868 (7th Cir. 2018). Nor does the application of the laws of different states to different claims violate Indiana's prohibition against intraclaim dépeçage. *Simon*, 805 N.E.2d at 801 ("Although Indiana allows different claims to be analyzed separately, it does not allow issues within those counts to be analyzed separately.").

G.    *Defendants have Adequately Pled Tortious Interference with Business Relationships*

Finally, Christy and Wesner have asserted claims for tortious interference with business relationships. (ECF No. 35 at 36-37). "The elements of tortious interference with a business relationship are: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944 (Ind. Ct. App. 2014).

The Court finds that Christy and Wesner have pled these elements. Plaintiffs' arguments to the contrary address the merits of the claims, not the way they are pled. (ECF No. 39 at 22). Plaintiffs' justification for enforcing the employee agreements, and the nature of Christy and Wesner's damages, can be argued either at summary judgment or trial.

The Court also rejects Plaintiffs' argument that the tortious interference claims violate their First Amendment rights. The Court does not read the counterclaim to allege that Plaintiffs' suit is the unjustified interference. Instead, it was the letters, both from Plaintiffs' and their counsel, trying to enforce the agreements that was the unjustified interference. (*See* ECF Nos. 35-3, 35-4, 35-7, 35-8, 35-9). These letters could, depending on other facts, support a claim for tortious interference with business relationships. *See Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 285 (Ind. 1991).

H.    *Defendants will be Granted Leave to Amend Some, but not All, of their Claims*

As a fallback argument, Defendants assert that, if their claims are dismissed, they are "entitled to amend." (ECF No. 42 at 3). That's not entirely true. With many of their claims now dismissed, Defendants no longer have a right to amend their counterclaim as a matter of course. *See* Fed. R. Civ. P. 15(a)(1) (right to amend expires 21 days after service of defendant's motion to

21

dismiss under Rule 12(b)). Ordinarily, however, a claimant whose original pleading has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend before the entire action is dismissed. The Seventh Circuit has said this repeatedly. *Luevano v. Wal–Mart Stores, Inc*., 722 F.3d 1014, 1024 (7th Cir. 2013); *Bausch v. Stryker Corp*., 630 F.3d 546, 562 (7th Cir. 2010); *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 & n. 3 (7th Cir. 2004) (collecting cases). Rule 15(a)(2) governs when court approval is needed to amend a pleading: "The court should freely give leave [to amend] when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (reversing denial of leave to amend by citing to Rule 15(a)(2)'s mandate to freely give leave to amend and stating "this mandate is to be heeded").

But leave to amend is not required. When the defect cannot be corrected so that amendment is futile, no harm is done by denying leave to amend and to entering an immediate final judgment, just as when an amendment has been unduly delayed or would cause undue prejudice to other parties. *See*, *e.g*., *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007); *James Cape & Sons Co. v. PCC Constr. Co*., 453 F.3d 396, 400–01 (7th Cir. 2006); *see also Foman*, 371 U.S. at 182 (leave to amend may be denied based on futility, undue delay, undue prejudice, or bad faith). Such cases of clear futility at the outset of a case are rare, though.

This is one of those rare cases, at least in part. There is no formulation of "they didn't turn off my email and voicemail" that states a claim under the Lanham Act, or the Pennsylvania or Florida privacy statutes. As explained above, these statutes require more. There is no way Defendants can amend their counterclaim, short of alleging a new factual basis for these claims, that would be anything but legally futile. Similarly, Defendants cannot amend their way around

the duplicate nature of their request for declaratory judgment. No leave will be granted to amend these claims.

The unfair competition claim is a separate matter. There, the Court finds that Defendants' inadequate pleading is a matter of omission rather than commission: they simply failed to allege the tort that undergirded their unfair competition claim. This can be fixed by amendment, so leave to amend will be granted as to this claim only.

## III. Conclusion

For these reasons, Plaintiffs' motion to dismiss the counterclaim (ECF No. 37) is GRANTED in part and DENIED in part. Counts III, IV, and V, as well as the claim under the Lanham Act and CDTC's claim for unfair competition, are DISMISSED. Defendants are GRANTED leave to amend CDTC's claim for unfair competition. The motion to dismiss is denied in all other respects.

SO ORDERED on June 30, 2022.

 s/ Holly A. Brady_____
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT