**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

3M COMPANY and 3M INNOVATIVE
PROPERTIES COMPANY,

        Plaintiffs,

    v.

CONTINENTAL DIAMOND TOOL CORP.,
PAUL CHRISTY, TIMOTHY KEENE, and
CHAD WESNER,

        Defendants.

CAUSE NO.: 1:21-CV-274-TLS

**OPINION AND ORDER**

Plaintiff 3M Company (3M) and Defendant Continental Diamond Tool Corp. (CDT) are

competitors in the superabrasives industry.[1] Individual Defendants Paul Christy, Timothy Keene,

and Chad Wesner are former 3M employees who now work for CDT. This case arises out of

3M's allegations that CDT lured away 3M's employees to obtain 3M's confidential information,

including trade secrets, in violation of the employees' 3M Employee Agreements and has been

using that information to compete to CDT's advantage. 3M also contends that Christy, Keene,

and Wesner—who all left 3M and began working for CDT between January and June 2021—

breached their 3M employment agreements by taking and using for CDT's advantage large

amounts of 3M's confidential information.

The Amended Complaint brings four claims against all the Defendants: tortious

interference with contract under Indiana state law (Count I); violation of the Defend Trade

Secrets Act, 18 U.S.C. § 1836(b) (Count II); violation of the Indiana Uniform Trade Secrets Act,

---

[1] Plaintiff 3M Innovative Properties Company owns all the intellectual property for 3M Company and
brings only the claims for trade secret violations in Counts II and III. *See* Resp. 14, ECF Nos. 111/125.

Ind. Code § 24-2-3 (Count III); and unfair competition under Indiana state law (Count IV). ECF No. 32. The state law breach of contract claim (Count V) is alleged against the Individual Defendants only. *Id.* The Defendants brought Counterclaims [ECF No. 35] and Amended Counterclaims [ECF No. 51], which the Court dismissed on 3M's motions. *See* ECF Nos. 48, 75.

This matter is now before the Court on a Motion for Partial Summary Judgment [ECF No. 94], Brief in Support [ECF No. 97], and Statement of Material Facts (SOF ¶¶ 1–116) [ECF No. 96]—filed by Defendants CDT, Christy, and Wesner and joined by Defendant Keene [ECF Nos. 100, 161]. 3M filed a Brief in Opposition [ECF Nos. 111/125], a Response to the Defendants' Statement of Material Facts [ECF Nos. 112/128], and a Statement of Additional Material Facts (SOAF ¶¶ 117–252) [ECF Nos. 112/128]. Defendants CDT, Christy, and Wesner filed a Reply in Support of Motion for Partial Summary Judgment [ECF No. 145] and a Reply to 3M's Statement of Additional Material Facts [ECF No. 146], both joined by Defendant Keene [ECF Nos. 148, 161]. 3M filed a Surreply in Opposition to Defendants' Motion for Partial Summary Judgment [ECF No. 157] to address evidentiary objections. As set forth below, the Court grants in part and denies in part the motion for partial summary judgment.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue

for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## EVIDENTIARY RULINGS

The Defendants make several evidentiary objections in the first fifteen pages of their Reply to 3M's Statement of Additional Material Facts, which was filed separately from their Reply Brief in Support of Summary Judgment. *See* N.D. Ind. L.R. 56-1(c) (requiring that the reply brief be filed separately from the "Reply to Statement of Additional Material Facts"). 3M's Surreply responds to these evidentiary objections. As an initial matter, the Court denies 3M's request to strike the objections for having been filed within the Defendants' Reply to 3M's Statement of Additional Material Facts instead of within the Defendants' Reply Brief in Support of Summary Judgment. Local Rule 56-1(f) requires that "[d]isputes about the admissibility or materiality of evidence must be raised in the parties' *briefs*" and prohibits the filing of a separate motion to strike. N.D. Ind. L.R. 56-1(f). Given the volume of evidence and complexity of the factual and legal arguments on the motion for summary judgment, the Court would have granted the Defendants leave to file an oversized reply brief to raise the evidentiary objections. *See* N.D. Ind. L.R. 7-1(e)(1) (setting a 15-page limit for reply briefs).

## A.    Objections Overruled as Moot

The Court overrules as moot the Defendants' objection to 3M's use of expert testimony to establish underlying facts in SOAF ¶ 226, which provides that, "[a]ccording to" its expert report, 3M's sales to a specific customer began to suffer in the second quarter of 2022 after certain tests. SOAF ¶ 226, ECF Nos. 112/128 (citing Ex. 1, p. 40, ECF Nos. 113-1/122, p. 44).[2] Because the expert does not opine that 3M's sales to that client suffered or reference the tests, the statement in ¶ 226 is unsupported by the cited evidence. The Court also overrules as moot the objection to the last sentence of SOAF ¶ 183 as hearsay because the sentence is not material to the Court's decision. The Court disregards facts, even if supported by the cited evidence, that are not material to the legal determinations before the Court. *See First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## B.    Statements of Law

The Defendants object that four paragraphs contain impermissible legal conclusions. *See Greene v. Westfield Ins.*, 963 F.3d 619, 627 (7th Cir. 2020) ("[A]ffidavits are for stating facts, not legal conclusions." (citing Fed. R. Civ. P. 56(c)(4))). The Court overrules the objection to ¶¶ 164, 166, and 171, which are fact statements based on 3M employee James McGinnis' declaration about 3M's trade secrets. *See* McGinnis Decl. ¶¶ 45, 47, and 52, ECF Nos. 111-1/126. The Court sustains the objection to paragraph ¶ 228 and strikes as a legal conclusion the statement that Keene was forbidden from calling on a specific client. *See Norfolk S. Ry. Co. v. Glob. Tower, LLC*, 620 F. Supp. 3d 784, 794–95 (N.D. Ind. 2022) ("But statements on the

---

[2] The Defendants' twenty-three exhibits are lettered, and their sealed exhibits are located at ECF Nos. 96 (Ex. A–L) and 146 (Ex. M–W). 3M's 138 exhibits are numbered, and its sealed exhibits are located at Docket Entries 113–120 and 135. 3M also filed the following attachments to its response brief but did not label them with exhibit numbers: Declaration of James McGinnis, three exhibits to McGinnis' declaration, and the Declaration of Peter Eisenberg. *See* ECF Nos. 111-1 to 111-5.

outcome of an ultimate issue is closer to impermissible legal argumentation than a recitation of a fact.").

**C.      Argument, Summaries, Speculation, Opinion, Characterization of the Evidence, and Facts Not Supported by Evidence**

Whether the subject of an objection or on the Court's own review, the Court disregards within the parties' fact statements substantive arguments, summaries, speculation, opinion, an attorney's characterization of evidence, facts not supported by any citation to evidence, and facts not supported by the cited evidence. *See, e.g.*, *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 716 (N.D. Ill. 2016) (explaining that arguments belong in the briefs, not the statements of fact); *Clifford v. Crop Prod. Servs., Inc.*, 627 F.3d 268, 273 n.6 (7th Cir. 2010) ("[S]tatements of lawyers are not evidence." (citing *United States v. Diaz*, 533 F.3d 574, 578 (7th Cir. 2008))); N.D. Ind. L.R. 56-1(b)(2)(D)(ii) (providing that a party opposing summary judgment must file an "additional facts section" that includes "a citation to evidence supporting each fact"); N.D. Ind. L.R. 56-1(e) ("The court may find a fact is not supported if the citation does not include a page or paragraph number to evidence in the record which can be presented in an admissible form unless the court may take judicial notice of the fact."). Thus, the Court does not consider all or portions of the following paragraphs of 3M's SOAF, which is not an exhaustive list: 118, 120, 172, 174, 178, 186, 187,[3] 189, 190, 192, 193, 197, 204, 216, 217, 219, 225, 227, 237, 238, 240, 241, 244, 245, 247, 249, 251. *See* ECF Nos. 112/128.

**D.      Declaration of James McGinnis**

As discussed in Part B of the Analysis below, the Defendants move for summary judgment on 3M's trade secret claims solely on the basis that 3M has failed to specifically

---

[3] The cited Exhibit 6 at Keene_008976 is not in the record. In a footnote in its Surreply, 3M asks to supplement the record with the missing page but did not file a copy for the Court's review.

identify its trade secrets. In support, the Defendants cite excerpts from the deposition of Peter

Eisenberg (3M's Federal Rule of Civil Procedure 30(b)(6) corporate designee) that are not

sufficiently specific to identify the trade secrets. In response, 3M offers the declaration of James

McGinnis, Operations Manager for 3M's facility in Royersford, Pennsylvania, who sets forth

nine categories of 3M trade secrets at issue in this litigation. The Court overrules the Defendants'

objection to 3M relying on McGinnis' declaration.

Without citation to law, the Defendants primarily object on the basis that 3M did not

designate McGinnis as a corporate representative under Rule 30(b)(6). However, 3M identified

McGinnis in its initial disclosures as an individual likely to have discoverable information on the

following subjects:

> The nature of the confidential information the Former Employees were exposed to
> while employed by 3M; 3M's practices and procedures with respect to
> confidentiality; the 3M Employee Agreement; CDT's solicitation of 3M
> employees; the Former Employees' departures from 3M; the breaches by the
> Former Employees of the 3M Employment Agreement; and 3M's damages and
> irreparable harm.

Ex. M, p. 3, ECF No. 146-1. These are the same subjects listed for Peter Eisenberg, who had two

additional subjects of "any confidential information the Former Employees took upon leaving

3M" and "the sales accounts the Former Employees serviced while at 3M." *Id.* at 2.

The Defendants' Notice of Rule 30(b)(6) Deposition requested that 3M designate

someone to testify on behalf of 3M with respect to several matters, including "[t]he information

that 3M considers to be confidential." Ex. N, p. 5, ECF No. 146-2. The Notice of Deposition

defined "3M Confidential Information" as "the definition of Confidential Information set forth in

the 3M Employee Agreement" and recited that definition, which includes, in relevant part,

"information, including but not limited to trade secrets, which [is] not generally known and is

proprietary to 3M" and for which examples are given such as "information about processes,

products, systems, services, research, development, know-how, designs, formulas, compilations,

manufacturing, purchasing, accounting, engineering, marketing, merchandising, selling, leasing,

servicing, finance and business systems and techniques." *Id.* at 6.

The Defendants argue that Eisenberg's Rule 30(b)(6) deposition testimony provided no

concrete information sufficient to describe with specificity the alleged trade secrets for which

3M is claiming misappropriation and that 3M should not be allowed to now rely on McGinnis to

identify the trade secrets. However, as argued by 3M and not contested by the Defendants, other

than one question each about processes, systems, and know-how, the Defendants did not ask

Eisenberg any questions about 3M's trade secrets and the Defendants' counsel did not use the

phrase "trade secret" during Eisenberg's deposition. To the extent the Defendants discuss 3M's

written objections in advance of the 30(b)(6) deposition, the Defendants did not file a motion to

compel, nor have they identified any questions Eisenberg was asked about trade secrets to which

3M objected on the bases set forth in the written objections. *See* Ex. O, ECF No. 146-3.

3M was not required to designate McGinnis as a corporate representative for him to

submit a declaration in response to summary judgment. 3M disclosed McGinnis in September

2021 as a 3M witness with knowledge of 3M's "confidential information." Although the

Defendants could have deposed McGinnis under Rule 30(b)(1), they did not. Rule 30(b)(6)

> says expressly that it does not preclude taking a deposition by any other procedure
> authorized under the rules. Thus, a party who wishes the deposition of a specific
> officer or agent of a corporation may still obtain it and is not required to allow the
> corporation to decide for itself whose testimony the other party may have.

Wright & Miller, 8A Fed. Prac. & Proc. Civ. § 2103 (3d ed. 2024). 3M represents that the

Defendants took no fact depositions. And the Defendants do not identify any of Eisenberg's

testimony that is inconsistent with or contradicted by McGinnis' declaration.

The Defendants also argue, without citation to law, for the exclusion of McGinnis' declaration because it was not subject to cross-examination. As noted by 3M, Rule 56(c)(4) requires that a declaration used to support a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). There is no requirement that an affiant be cross-examined for the declaration to be used on summary judgment. *Oto v. Metro. Life Ins.*, 224 F.3d 601, 604–05 (7th Cir. 2000).

Next, the Defendants argue that McGinnis' declaration lacks personal knowledge "in certain respects." Resp. SOAF 13, ECF No. 146; *see* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Yet the Defendants also state that "the wording of portions of the declaration would indicate at least some personal knowledge," Resp. SOAF 14, and they do not identify any portions that lack personal knowledge. The declaration states that McGinnis had been employed by 3M "for over 41 years, predominantly in product management and operations for the Precision Grinding & Finishing ('PG&F') business." McGinnis Decl. ¶ 1, ECF Nos. 111-1/126. He is the Operations Manager for the Royersford facility, overseeing its operations, and worked "closely" with the individual defendants. *Id.* ¶¶ 1, 2. The Defendants have not shown that McGinnis lacks the requisite personal knowledge.

Finally, the Defendants assert that McGinnis' declaration is conclusory "at times" but identify only ¶¶ 45 and 46, which assert that "key account contacts and customer preferences" for 53 specifically identified companies are trade secrets. The identity of the 53 customers is sufficiently specific. To the extent the Defendants fault McGinnis for not considering the age of certain documents, that goes to McGinnis' credibility, the weight given to his testimony, or the determination of whether the documents are in fact trade secrets—issues for the factfinder.

### E.    Unauthenticated Documents

On summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]he most fundamental test of authentication [is] . . . some minimal showing that the document is what its proponent claims it is." *Ragan v. Jeffboat, LLC*, 149 F. Supp. 2d 1053, 1062 (S.D. Ind. 2001) (citing Fed. R. Evid. 901(a)). "There is no requirement that documents submitted to oppose summary judgment be fully authenticated, provided these documents can be authenticated and rendered admissible at trial and provided there is no common sense or compelling reason for the court to doubt their authenticity at summary judgment." *PrimePay, LLC v. OneSource Virtual, Inc.*, No. 3:18-CV-300, 2023 WL 5175496, at *14 (N.D. Ind. Aug. 11, 2023). The Defendants object that 3M did not authenticate several documents that are identified simply by their Bates stamp number and that, in some instances, 3M's counsel provides unsworn information respecting the document. In response, 3M contends that all documents produced will be admissible at trial.

The Court overrules the authentication objections to the following paragraphs as documents capable of authentication at trial: ¶¶ 155 and 156 (3M contracts) (Ex. 131, ECF Nos. 120-11/121-36; Ex. 132, ECF Nos. 120-12/121-37/134-5); ¶ 199 (3M Code of Conduct, four internal 3M memos) (Ex. 83, 3M_000097, 3M_001154, 3M_001166, 3M_001171, 3M_001868, ECF Nos. 118-1/121-26, pp. 2, 66, 78, 83, 86); and ¶¶ 217, 218, 224 (emails) (Exs. 96, 97, 103, ECF Nos. 118-14, 118-15/124-14, 119-2). The Court overrules the objection to the evidence cited in ¶¶ 144, 148, 149, 151, and 154 because the documents are identified by McGinnis— 3M's Operations Manager at the Royersford plant—as 3M drawings or other information and appear capable of authentication at trial. McGinnis Decl. ¶¶ 25, 29, 30, 35, ECF Nos. 111-1/126. The Court overrules as moot the objection to the general reference to 366 pages of emails and

texts from "former or current 3M contractors" in ¶ 214 (Exs. 18–21, ECF Nos. 114-6 to 114-9) because 3M has not explained how any specific page in Exhibits 18–20 is relevant, Exhibit 21 was not sent to Christy by a 3M contractor, and no exhibit includes the drawing referenced in ¶ 215. *See* SOAF ¶ 215, ECF Nos. 112/128. The Court overrules as moot the objection to ¶ 189 and ¶ 198 because they are not material to the Court's decision.

Paragraph 190 cites a "PG&F NA SWOT Analysis" and a "SWOT: PG&F North America"—documents that were in Keene's basement. *See* Ex. 6, Keene_008972–008973, ECF Nos. 113-6/122-1, pp. 34–35. The Court overrules the objection to their contents but sustains the objection to all characterization for lack of supporting evidence. The Court also sustains the objection for lack of supporting evidence to the characterization in ¶ 191 of the documents in Keene's basement as "confidential" and to the unspecified documents referenced in ¶ 199 as "'confidential information' under 3M IP policies and its employee agreement."

The Court sustains in part and overrules in part the Defendants' objection to ¶ 213, which states that Christy had various 3M information in his Gmail account (Ex. 14), his CDT documents folder (Ex. 15), his iCloud storage (Ex. 16), and his CDT email (Exs. 17a–d). SOAF ¶ 213, ECF Nos. 112/128. The cited exhibits are emails and other documents capable of authentication at trial and thus can be considered but are not individually cited by 3M. Ex. 14, ECF No. 114-2; Ex. 15, ECF No. 114-3; Ex. 16, ECF No. 114-4; Ex. 17a–d, ECF Nos. 135-4/136-4. However, the Court strikes the parts of ¶ 213 stating where the documents were found because there is no evidence—such as indicia on the emails or documents, deposition testimony, or a declaration—that the emails and/or documents were retained in Christy's Gmail or were found in his iCloud storage or in his CDT documents folder or email.

For ¶ 216, the Court sustains in part and overrules in part the Defendants' objection to the emails in Exhibits 12, 14, 15, and 16 being characterized as 3M documents that Christy deleted

from his email or documents incoming to his CDT email account. The Court sustains the objection to Exhibits 14–16 for the same reasons as ¶ 213 and for lack of indicia that the emails were "incoming" to Christy's CDT email. *See* Exs. 14–16, ECF Nos. 114-2 to 114-4. The objection is overruled as to Exhibit 12, ECF No. 114, because the documents show that Christy sent the emails to himself and, elsewhere, the Defendants do not object to this characterization. *See* Resp. SOAF ¶¶ 211 (second sentence), 212 (citing Ex. 82, ECF No. 135-14, a duplicate of Exhibit 12), ECF No. 146, p. 71.[4]

## MATERIAL FACTS

### A.    The Corporate Parties

Plaintiff 3M Company (3M) is a global leader in advanced abrasive technologies with a precision grinding and finishing (PG&F) division. Am. Compl. ¶ 1; Ex. A, 8:25–9:5, ECF Nos. 96-1/107-1/133-1. Plaintiff 3M Innovative Properties Company is a wholly owned subsidiary of 3M and owns all 3M's intellectual property, licensing it back to 3M. Am. Compl. ¶ 9; Ex. A, 200:15–25. In June 2007, Wendt Dunnington (Wendt), a leading provider of superabrasives (bonded grinding tools used in the cutting tool, automative, turbine, machine tool, and steel industries) with a primary U.S. location in Royersford, Pennsylvania, was bought by Winterthur Technologies AG (Winterthur); 3M acquired Winterthur in 2011. McGinnis Decl. ¶¶ 6–8, ECF Nos. 111-1/126; Ex. 54, ECF Nos. 116-13/123-16. Wendt employees became 3M employees, and each was required to sign 3M's Employee Agreement, including Individual Defendants Paul Christy, Chad Wesner, and Tim Keene and the other 3M "Former Employees" defined in Part D below. Ex. A, 118:3–6; Ex. E, 130:20–131:5, ECF No. 96-5; Ex. F, 132:19–133:6, ECF Nos. 96-6/107-3; Ex. G, 62:11–20, ECF Nos. 96-7/107-4/133-2; McGinnis Decl. ¶¶ 8, 9.

---

[4] Throughout, the Court cites Exhibit 12 in lieu of the duplicate Exhibit 82.

Defendant Continental Diamond Tool Corporation (CDT) is a global manufacturer of superabrasive grinding wheels located in New Haven, Indiana, and a direct competitor of 3M. Ex. B, 8:21–9:6, ECF No. 96-2; Am. Compl. ¶¶ 2, 10. About fifteen years ago, Nicholas Viggiano—president and owner of CDT—worked to make CDT more competitive and successful in the industry, including investment in equipment and research and development. Ex. B, 9:11–12:16; Ex. C, 10:23–25, ECF No. 96-3. In October 2017, having heard that 3M may be selling its superabrasives division, Viggiano texted 3M to express an interest on behalf of CDT. Ex. 60, ECF No. 116-19; *see also* Ex. 61, at 3M_001049, 3M_001077, ECF Nos. 116-20/121-19, pp. 2, 9; Ex. 47, 208:16–209:10, ECF Nos. 116-6/123-11.

In May 2020, Viggiano learned one of 3M's overseas facilities for conventional wheels had burned down. Ex. 47, 203:23–204:20, ECF No. 116-6/123-11. When asked if the fire would make 3M more willing to sell its superabrasives business to CDT, he said, "No. I was not interested in conventional wheels." *Id.* 205:3–6. On August 3, 2020, Viggiano told Shane Vardaman (a minority owner of CDT) that 3M was closing two facilities. *Id.* 206:23–207:16; Ex. 52, ECF Nos. 116-11/123-14; Ex. B, 191:17–21. Viggiano was interested in the closings because 3M is "a competitor; they're in our industry. If I'm not doing this, I don't think I'm doing my job." Ex. 47, 207:8–12.

On February 10, 2021, the day after interviewing 3M employee Christy, Viggiano emailed Vardaman: "Almost thinking it might be worth taking another run at 3M and purchase them." Ex. 65, ECF Nos. 116-24/123-23; *see* Ex. F, 69:20–72:19; Ex. 10, ECF Nos. 113-10/121-9. Later that day, Vardaman emailed: "I think I like the idea of 1 last attempt to steal the sinking ship of 3M." Ex. 53, ECF Nos. 116-12/123-15. On February 22, 2021, Keene (fired from 3M in January 2021) provided Viggiano with 3M contact information, writing that "timing is critical" and "[t]he pressure [at 3M] is great to increase order in-take between now and March 31[.] This

is not happening and Q1 is shaping up to be a disaster . . . . [I]t is important to retain key resources (technology & personnel) at Royersford." Ex. 66, ECF Nos. 117/123-24; Ex. A, 219:24–220:3. Viggiano emailed 3M on February 23, 2021, to discuss acquiring the 3M superabrasives business; 3M responded that it was open to a discussion but had "no plans to exit at this point." Ex. 67, ECF Nos. 117-1/123-25. In 2023, CDT again reached out to 3M about an acquisition. Ex. 43, ECF Nos. 116-2/121-14.

**B.    The 3M Employee Agreement**

The 3M Employee Agreement provides, in pertinent part:

1.    In this AGREEMENT the following definitions apply:

. . .

B.    **CONFIDENTIAL INFORMATION** means information, including but not limited to trade secrets, which is not generally known and is proprietary to 3M including, by way of example and not limitation, information about processes, products, systems, services, research, development, know-how, designs, formulas, compilations, manufacturing, purchasing, accounting, engineering, marketing, merchandising, selling, leasing, servicing, finance and business systems and techniques. It also includes similar information of a third party who has entrusted such information to 3M. It shall be presumed that all such information which is disclosed to me or to which I obtain access during the period of my employment, whether originated by me or by others, and which I have reasonable basis to believe is Confidential Information or is treated by 3M as Confidential Information is Confidential Information regardless of whether the information is marked as confidential.

. . .

D.    **CONFLICTING PRODUCT, PROCESS, SYSTEM OR SERVICE** means any product, process, system or service of any person or organization other than 3M, in existence or under development, which is the same as or similar to or competes with a product, process, system or service about which I acquire Confidential Information at any time during my employment with 3M or upon which I work (in either a sales or a non-sales capacity) during the last three years of my employment by 3M.

E.    **CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in, research on or development, production, marketing, leasing, selling or servicing of a Conflicting Product, Process, System or Service.

. . .

3. I am or will be employed by 3M in a capacity in which I may receive or contribute to Confidential Information. . . . I agree that:

. . .

B. I understand and agree that my employment creates a relationship of trust between me and 3M with respect to Confidential Information. Except as required in my duties to 3M, I will never, either during my employment by 3M, or thereafter for so long as applicable law provides, use or disclose any Confidential Information as defined in paragraph 1(B) above. During my employment by 3M, I will not own, operate or render services directly or indirectly as an employee or consultant/advisor to a Conflicting Organization.

. . .

F. FOR a period of two years after termination of my employment with 3M for any reason:

1. I will inform any new employer, prior to accepting employment, of the existence of this Employee Agreement and provide such employer with a copy thereof.

2. If I have been or am employed by 3M in a sales capacity, I will not render services directly or indirectly to any Conflicting Organization involving: (a) the development, manufacture, marketing, advertising or servicing of any Conflicting Product, Process, System or Service in the United States, or (b) the solicitation of any person or organization I, or someone I supervised, called upon during the last three years of my employment by 3M in connection with the sale, lease or license of any Conflicting Product, Process, System or Service.

3. If I have been or am employed by 3M in a non-sales capacity, I will not render services directly or indirectly to any Conflicting Organization in the United States or in any country in which 3M manufactures or produces a product upon which I work during my employment with 3M or in which 3M provides a service in which I participate during my employment by 3M, except that I may accept employment with a large Conflicting Organization whose business is diversified (and which has separate and distinct divisions), provided 3M, prior to my accepting such employment, shall receive separate written assurances satisfactory to 3M from such Conflicting Organization and from me, that I will not render services directly or indirectly in connection with any Conflicting Product, Process, System or Service.

4. If I intend to accept or do accept an offer of employment from a person or organization that I should have reason to believe may be a Conflicting Organization within the meaning of paragraph 1(E) of this Agreement and that may cause me to render services to the Conflicting Organization within the two-year period provided for in paragraph 3(F), I will immediately disclose to 3M the name and location of the employer and

the time I will begin to render such services. Such notice shall be in
writing and mailed to the address set forth in paragraph 9 of this
Agreement.

. . .

9.  I agree that I will not personally, or by providing assistance to any other
person or entity, directly or indirectly: (i) solicit, entice or encourage
any individual employed by 3M to terminate or leave the employment
of 3M, or (ii) offer to employ or retain-as an employee, independent
contractor, consultant, agent or in any other capacity-any individual
employed by 3M.

Ex. F, Dep. Ex. 5, ECF Nos. 96-6/107-3, pp. 44–46; Ex. G, Dep. Ex. 3, ECF Nos. 96-7/107-

4/133-2, pp. 23–25.

**C.    The Individual Defendants**

*1.    Paul Christy*

a.    Christy's employment at 3M and CDT

First at Wendt and then at 3M, Christy built dressing spindles and in-feeds for use on

machines; he was in charge of manufacturing and traveled for sales and technical meetings. Ex.

F, 114:5–22. 3M moved Christy into the sales department about five years before he left 3M. *Id.*

95:17–21, 114:15–18.

Unhappy at 3M and looking for a technical assistance position, on January 27, 2021,

Christy asked Bill Brown, a former colleague now at CDT, if CDT was hiring. Ex. F, 51:10–

53:18, 64:9–15, 94:18–22, 114:24–115:3; Ex. H, 33:7–20, ECF No. 96-8. The same day, Brown

texted Vardaman: "Had dinner with Paul Christy tonight and he has expressed an interest in

CDT. He is the dresser spindle guy." Ex. 9, ECF No. 113-9. Vardaman replied: "I had a plan to

discuss with [Christy] but we really need him free of 3M to try to avoid the non compete." *Id.*

Christy also talked with CDT sales representative Ian Bennett, a former 3M colleague. Ex. F,

54:23–55:8. Christy did not speak with Keene or Wesner about working for CDT. *Id.* 55:9–57:4.

Vardaman contacted Christy about employment at CDT based on a contractor speaking highly of him and Christy being knowledgeable and a "good standup guy" with industry experience. Ex. D, 49:2–50:5, ECF Nos. 96-4/107-2. CDT was interested in Christy because he had experience on the diamond tool side, he used to support spindles, and "he is a good mechanical guy." Ex. B, 94:17–95:8. On February 9, 2021, Christy visited CDT and was impressed. Ex. F, 69:20–72:19; Ex. 10, ECF Nos. 113-10/121-9. Prior to the visit, Vardaman emailed Christy: "I understand that you currently have a non compete that we will be reviewing and verifying we do not compromise this agreement for your sake and ours." Ex. F, Dep. Ex. 2, ECF Nos. 96-6/107-3, p. 42. In a February 11, 2021 email chain with Vardaman regarding salary negotiations, Christy wrote, "CDT is an impressive company and is poised to become the leader in Superabrasives," "I would very much enjoy working with you in achieving the goals that you all have set," and "I would love to eventually get you guys in the dressing system business." Ex. 32, Christy_006337–38, ECF Nos. 115-7/136-12, pp. 2–3.

On March 22, 2021, Christy emailed 3M to inform them he was leaving his employment with 3M (giving the reasons for the decision), provide two weeks' notice, disclose that he would be working for CDT, and request a release from the non-compete agreement. Ex. F, Dep. Ex. 6, ECF Nos. 96-6/107-3, p. 47; Ex. A, 154:20–23, 155:19–156:1.

On April 16, 2021, Christy began working for CDT as an application engineer. Ex. 22, ECF Nos. 114-10/134-2; Ex. D, 18:19–20; Ex. F, 103:15–21. On June 1, 2021, a lawyer for 3M wrote to Christy objecting to his employment with CDT, and Christy forwarded the letter to CDT. Ex. 22; Ex. F, 181:21–23, 184:8–16. On July 30, 2021, 3M contacted Christy and demanded that he cease his employment with CDT. Ex. F, 189:19–191:24. On July 31, 2021, 3M denied Christy's request for permission to work for CDT. Ex. A, 155:19–156:1.

The CDT Job Description for Christy listed his "Position" as "Senior Product Engineer," and the "Job Summary" provided: "The Senior Product Engineer is a key member of the support team that works alongside Engineering and Production to provide customer support throughout the process. This role is key in providing on-site and remote customer technical support." Ex. 30, ECF Nos. 115-5/121-11. The "Job Duties" include "Support and Develop Products," "Support sales through entire quoting and testing process," and "Coordinate with sales, engineering, production, and quality to best serve the customer." *Id.*

b.     The documents Christy emailed to himself while at 3M

Between February 3 and March 18, 2021, Christy emailed approximately 122 pages of documents from his 3M account to his personal account. Ex. 12, ECF Nos. 114/122-5. This was "20 messages that contained various 3M proprietary information including PDFs, PowerPoint slides and Excel spreadsheets that contained various levels of sensitive 3M information." Ex. 92, ECF Nos. 118-10/121-28, p. 4. Christy testified the emails had nothing to do with CDT. Ex. F, 157:16–24. In both an April 2021 security interview and his deposition, Christy stated that he emailed himself documents because employees at 3M were working from home. *Id.* 154:12–21; Ex. T, 14:20–16:8, 51:6–52:2, ECF No. 146-8; Ex. 92, ECF Nos. 118-10/121-28, p. 4. On April 6, 2021, Christy signed a certification for 3M that he had deleted this information. Ex. 92, ECF Nos. 118-10/121-28, pp. 4–5. Christy testified that he deleted the files and documents he had emailed to himself, including files he found during a computer search after the certification. Ex. F, 155:18–156:9, 157:24, 159:11. When asked by CDT about the 3M documents, Christy told CDT he had deleted the documents with a certification to 3M. Ex. C, 137:17–139:16.

c.     Christy's customers at 3M and CDT

Christy understood that CDT hired him to perform technical support for CDT products and sales, which he testified he did not do at 3M in the last years while doing sales. Ex. F, 95:3–

96:16. However, 3M testified that all salespeople "had technical support duties." Ex. 3, 125:14–126:3, ECF No. 135-1. Christy began doing sales for CDT in the ceramic grinding industry, which he did not work in at 3M, and his ceramics customers were different from those he serviced at 3M. Ex. F, 98:14–99:19, 105:6–23, 111:9–18, 113:10–114:2. Christy did technical support for CDT, including on carbides, which he did not do at 3M. *Id.* 114:3–4; Ex. W, 106:11–24, ECF No. 146-11. However, 3M contends that "at CDT, Christy continued to service customers he serviced while at 3M," naming SKF Kaydon, Timken, Pratt & Whitney, and USACH Harding. *See* Resp. SOF ¶ 70, ECF Nos. 112/128 (citing exhibit page ranges with no discussion).

      1)      SKF (Kaydon Sumter)

On February 3, 2021, while at 3M, Christy forwarded to himself a February 2020 email chain with the subject line: "3M Dresser Replacement Quotation #20-6043-1608"; the chain was a parts request from SKF to Christy, which Christy forwarded to Geoff Sheaffer at 3M, who then emailed 3M's quotation to SKF, copying Christy. Ex. 34, 3M_001435–39, ECF Nos. 115-9/123-3, pp. 3–7.[5] On February 3, 2021, Christy sent SKF an email with the same subject line, indicating that he would be in their area and asking if they needed anything. Ex. 34, 3M_001335, ECF Nos. 115-9/123-3, p. 2. He forwarded the email to his personal account and then deleted it under the non-compete. Ex. 33, 234–37, ECF Nos. 135-9/123-3. Christy testified that SKF was not his 3M customer and that he was probably offering to visit at someone's request. *Id.* 235:2–17. Emails from October 2022, when Christy was at CDT, show a sales representative informing SKF that he had talked with Christy who was interested in working together on SKF's diamond

---

[5] 3M cites 3M_026338 as part of Exhibit 34 but did not file that page. *See* ECF Ex. 34, Nos. 115-9/123-3.

rolls and then providing information to Christy for CDT to quote a product for SKF. Ex. 34, Christy_CDT_010708–11, ECF Nos. 115-9/123-3, pp. 8–11.

2)    Timken

Christy testified that Timken in Lebanon, New Hampshire, was his customer at 3M whom he visited in late 2020 but that the other Timken locations around the country were not his customers. Ex. 33, 119:21–121:21, ECF Nos. 135-9/123-2. On February 17, 2021, Vardaman forwarded to Christy's personal email address an email chain with "initial feedback from Timken," and wrote, "See below, maybe a nudge from a long tenured well respected guy might make them give CDT a chance?" Ex. 35, Vardaman_CDT_175265–66, ECF Nos. 135-10/123-4, pp. 8–9. Christy, who was still with 3M, responded, "I shouldn't tell you this, but" and then provided specific information about 3M business with Timken Lebanon. Ex. 35, Vardaman_ CDT_175265, ECF Nos. 135-10/123-4, p. 8. Christy testified that he had not called on any Timken facilities since working for CDT. Ex. 33, 122:2–3, 204:11–13, ECF No. 135-9.[6]

3)    Pratt and Whitney (P&W)

On February 23, 2021, P&W contacted Christy at 3M about a purchase order for a grinding wheel; later that day, Christy asked a 3M colleague for the prints of diamond wheels supplied to P&W East Hartford in 2019; the next day, the colleague forwarded the prints; and Christy sent them to himself the same day. Ex. 126, 3M_001463–66, Nos. 120-6/121-34.

---

[6] In asserting in response to SOF ¶ 70 that Christy serviced Timken at CDT, 3M cites two emails between Christy and a contractor in late 2021 but does not identify any reference to Timken therein. Resp. SOF ¶ 70, ECF Nos. 112/128 (citing Ex. 35, Christy_CDT_055557–80, Christy_021982, ECF No. 135-10/123-4, pp. 10–33, 34); *see also* SOAF ¶ 243 (citing Ex. 117, Christy_CDT_055557, 055560, No. 119-16; Ex. 118, Christy_021982–86, ECF No. 135-18/124-32). 3M also cites Christy's February 6, 2021 email forwarding to his personal email a February 16, 2019 engineering document from that same contractor addressed to Keene at 3M about data for Timken-Bucyrus. *See* Resp. SOF ¶ 70, ECF Nos. 112/128 (citing Ex. 35, 3M_001726–27, ECF No. 135-10/123-4, pp. 2–3); SOAF ¶ 149, ECF Nos. 112/128 (citing Ex. 12, 3M_001727–42, ECF No. 114/122-5, pp. 90–105). It is unclear how this document is relevant given 3M not citing evidence that Christy serviced any Timken clients at CDT.

On May 4, 2021, an engineer at P&W emailed *Keene* at CDT about visiting their facility, and on May 7, 2021, after the visit, Keene asked the engineer to send him the wheel and dresser drawing to generate a quotation for the project. Ex. 36, Christy_CDT_014681, ECF Nos. 115-11/123-5, p. 5. On May 12, 2021, the engineer responded with as much information as she could provide "while still respecting the disclosures the drawings have on them." *Id.* Christy_CDT_014680, ECF No. 115-11/123-5, p. 4. The same day, Keene emailed Wirth (CDT's head engineer) and Tony Giacherio at Consort Precision Diamond (a subsidiary of CDT) to ask for wheel and roller dresser quotations for P&W East Hartford; Consort Precision Diamond provided a quotation on May 18, 2019. *Id.* Christy_CDT_014678–799, ECF No. 115-11/123-5, pp. 3–4; Ex. 57, 14:11–17, ECF Nos. 116-16/123-167; Ex. R, 81:9–19, ECF Nos. 146-6/155, p. 59. Christy was not copied on these emails. However, on July 27, 2021, Giacherio forwarded the emails to Christy and said, "This is the only roll I've quoted for Tim to PW. Let me know if this will work for you." Ex. 36, Christy_CDT_014678, ECF Nos. 115-11/123-5, p. 2.

While acknowledging that Christy deleted the P&W diamond wheel prints forwarded by his 3M colleague once he was at CDT, 3M notes that CDT obtained P&W East Hartford's business in December 2021. Ex. 36, Christy_CDT_020603–10, ECF Nos. 115-11/123-5, pp. 8–15; Ex. 127, Christy_CDT_020603–09, ECF Nos. 120-7/124-39. Christy sent a text to Vardaman acknowledging the new business. Ex. 36, Vardaman_103412, ECF Nos. 115-11/123-5, p. 16; Ex. 128, ECF Nos. 120-8/124-40.

Christy testified about the P&W facilities he visited at CDT, which he stated he did not call on for 3M: "I went to a Pratt facility in East Hartford, which I said, as a technical support. And I went at the request of a friend of mine at Pratt corporate to talk about business that will happen at a new plant that they're building in [Asheville]." Ex. 33, 122:11–19, ECF Nos. 135-9/123-2; *see* Ex. 121, Christy_CDT_043938–40, ECF Nos. 120/136-21, pp. 4–6. Christy also

testified, "I haven't been other places, to ones that were my customers, no." Ex. 33, 122:21–123:1, ECF Nos. 135-9/123-2.

    4)    USACH Hardinge

Christy testified that, although Hardinge was not assigned as his customer at 3M, he had called on them as a salesperson for dressing systems, supporting another 3M salesperson. Ex. 33, 125:11–24, ECF Nos. 135-9/123-2. For CDT, he went to the Hardinge Tooling Group in Elmirea, where he had not been for 3M, to work on grinding carbide; he testified that he believed "Hardinge owns other facilities that I had been into before out in the Chicago area selling dressing systems to." *Id.* 124:21–125:5; Ex. F, 115:19–116:16. On July 15, 2022, someone at Hardinge emailed Christy at CDT, asking several technical questions and saying, "I have a question regarding the MK III dressing spindle. I realize you don't work for 3M but any help would be appreciated." Ex. 37, Christy_CDT_040371, ECF Nos. 115-12/123-6, p. 8. On July 18, 2022, Christy responded with answers to the technical questions about the 3M spindle. *Id.*

d.    Christy and Spindles

CDT only sells spindles sourced from a supplier as a "buy out," including spindles under the CDT brand name such as the "series two" CDT spindle. Ex. B, 56:14–24; Ex. Q, 92:21–93:23, ECF No. 146-5; Ex. S, 164:2–8, 167:13–14, 241:20–242:21, 243:17–244:3, ECF Nos. 146-7/Ex. 155, pp. 62–67; Ex. T, 102:2–22.[7] Christy testified that he did not design, repair, or manufacture spindles at CDT. Ex. T, 102:2–6.

---

[7] In response to SOF ¶ 68, 3M cites Exhibit 31 as containing pages 71 to 125 of Christy's first deposition. *See* ECF Nos. 112/228, p. 26. But Exhibit 31 contains no deposition excerpts. *See* ECF Nos. 115-6/135-8. In response to SOF ¶ 68, 3M also cites Exhibit 31 as containing Christy's Deposition Exhibits 42, 43, 45, and 47–52 but does not provide any page numbers; Exhibit 31 contains 217 pages, and the documents and emails therein are not labeled with deposition exhibit numbers. *See* ECF No. 135-8. Therefore, the Court does not rely on Exhibit 31, ECF Nos. 115-6/135-8. In response to SOF ¶ 69, 3M cites generally seven pages of its expert's report regarding Christy and dresser spindles; the Court will not search the report for relevant facts. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); N.D. Ind. L.R. 56-1(e).

1)      3M ASSM, MK2 cantilever spindle with drawing number D8377-11

In October 2020, Christy, at 3M, sent an email to an original equipment manufacturer (OEM A) with an attachment listed as "D8377-11 (Spec).pdf." Ex. 96, ECF No. 118-14;[8] McGinnis Decl. ¶¶ 40, 46(a)(xxxix). In June 2021, Christy, working for CDT, sent an empty email to a different superabrasive contractor (who also works with 3M) with no subject and with an attachment listed as "D8377-11(Spec).pdf"; the attachment is an undated specification drawing of a 3M ASSM, MK2 cantilever spindle with drawing number D8377-11 and is labeled as 3M confidential property. Ex. 93, ECF Nos. 118-11/124-12; McGinnis Decl. ¶ 37.[9]

On December 6, 2021, at 1:23 p.m., OEM A emailed Christy at CDT, writing that "[t]his isn't your problem now" but asking who at 3M was running the dresser spindle business because a customer wanted to apply a 3M MK II spindle. Ex. 97, ECF Nos. 118-15/124-14. At 5:07 p.m., Wesner emailed Viggiano, Vardaman, and Keene with a subject "Spindle equipment," an attachment listed as "Dressing systems list.xlsx," and the text: "Please see the attached spreadsheet for the initial equipment to get started in the spindle business." Ex. 98, ECF Nos. 135-15/124-15. Christy testified that he did not have discussions with Wesner about getting into the spindle business and "[a]nything we ever talked about, that would be way off in the future after my noncompete. We do not [manufacture spindles]." Ex. T, 89:4–22. At 9:16 p.m., Christy sent an empty email back to OEM A. Ex. 97.

On December 15, 2021, Christy emailed Wesner at his iCloud email address: "We will need part numbers for buy out," providing specific item descriptions that included a CDT Series

---

[8] The attachment is not included in Exhibit 96.
[9] 3M also offers Exhibit 94—an undated specification drawing of a 3M ASSM, MK2 cantilever spindle with different drawing and description numbers and different specifications from Exhibit 93. *See* Ex. 94, ECF No. 118-12 (drawing number D8377-07). There is no accompanying email or any context provided to demonstrate its relevance.

2 Cantilever Style Rotary Dresser Spindle. Ex. 99, ECF Nos. 118-17/124-16.[10] A December 15, 2021 specification drawing of a CDT Series 2 Cantilever Style Rotary Dresser Spindle is labeled as CDT confidential property. Ex. 95, Christy_000004, ECF Nos. 118-13/124-13.

The next day, Wesner asked CDT to prepare a spindle quote for OEM A (whom Christy had contacted in October 2020 for 3M and who had contacted Christy earlier in December 2021) based on Christy's item descriptions, including the CDT spindle. Ex. 100, ECF Nos. 118-18/124-17. Wesner wrote that the spindle would be purchased from the superabrasives contractor to whom Christy had sent the June 22, 2021 email with the 3M ASSM, MK2 cantilever spindle drawing (D8377-11), and that CDT had sold the same spindle for a similar project. *Id.*; *see* Ex. 93, ECF Nos. 118-11/124-12. In February 2022, Wesner emailed a contact at ITM about his experience in the dressing systems business and attached drawings of CDT's "ST II spindle" that CDT "supplied to another customer." Ex. 102, ECF Nos. 119-1/124-19.

2)    Cantilever dressing spindle order for a specific end user

In January 2021, a 3M distributor followed up with Christy at 3M about restarting a pre-pandemic cantilever dressing spindle order for a specific end user, and Christy responded. Ex. 103, ECF Nos. 119-2/121-29. On February 17, 2021, Christy forwarded the email chain to Keene at 3M, blind carbon copying himself. *Id.*

On October 29, 2021, a contractor working for the same end user emailed Christy, who was at CDT, thanking him "for joining the meeting . . . and for sharing your expertise . . . regarding the Wendt dressing system" and referring to measuring "both the analog output and the speed signals you highlighted." Ex. 104, ECF Nos. 119-3/124-20. Christy testified that he had

---

[10] The Court finds immaterial Christy's December 15, 2021 text to an outside contractor of a photo of an "Original Dunnington spindle," which was a spindle from the mid-1990s Christy used as a paperweight. Ex. 101, ECF No. 119; Ex. T, 85:4–17.

been gathering data for manufacturing purposes; that the work was unrelated to 3M proprietary information or 3M sales; and that the reference to his expertise regarding the Wendt system was about general "machine tool function" and "normal maintenance level diagnostics." Ex. T, 61–68. In January 2022, CDT emailed a quote for parts to a customer for the same end user; Christy is copied on the return email with the customer's purchase order. Ex. 106, ECF Nos. 119-5/124-22. In February 2022, the same end user ran dresser tests with CDT's dressers at one of 3M's customers. Ex. 107, Christy_CDT_049312–13, ECF Nos. 119-6/124-23, pp. 3–4.

 3)  Other 3M customers

In February 2022, Christy at CDT messaged an OEM company president—to whom Christy, while still at 3M in March 2021, sent a return email via a "reply all"—that he was at one of the OEM's locations servicing its machines. Ex. 122, Christy_022946, ECF Nos. 120-1/124-35, p. 5; Ex. 119, ECF Nos. 119-18/121-32. On July 25, 2022, the OEM president sent Christy an email at CDT, attaching a 3M drawing and a 2017 purchase order placed with 3M and asking, "Believe the purchase order shown and the reference quote are the two systems I need quoted. Need two of these quoted, something you can provide?" Ex. 120, ECF Nos. 119-19/124-33. In September 2022, someone else at that OEM, copying the president and others, emailed Christy with questions about a CDT wheel and comparing it to the Wendt wheel that had previously been used; Christy forwarded the email to an outside contractor. Ex. 122, Christy_CDT_019864–66, ECF Nos. 120-1/124-35, pp. 2–4.[11]

3M asserts that Christy called upon that same outside contractor to conduct tests for CDT at six of 3M's customers, citing without analysis several Bates stamp page ranges of Exhibit 121.

---

[11] The materiality of Christy_CDT_205080, cited by 3M in SOAF ¶ 245, is not explained. It is a November 2022 email from a spindle company to Christy with the first page of a promotional article about the company providing spindles to the OEM referenced in the text above. *See* Ex. 122, ECF No.

SOAF ¶ 245. While all six are listed by McGinnis as 3M customers, McGinnis Decl. ¶ 46, the cited evidence only references the outside contractor in relation to four of them.[12] On November 29, 2021, Christy set a meeting with the contractor at one customer's facility. Ex. 121, Christy_CDT_040084–85, ECF Nos. 120/136-21, pp. 2–3. On January 20, 2022, Christy emailed a second customer regarding a quote and offered to bring in the contractor to do an evaluation. *Id.* Christy_CDT_049966, ECF Nos. 120/136-21, p. 7. On November 18, 2022, Christy emailed to schedule a visit with the contractor at a third customer. *Id.* Christy_CDT_050788–89, ECF Nos. 120/136-21, pp. 19–20. The fourth customer is P&W discussed above. *Id.* Christy_CDT_ 043938–40, ECF No. 120/136-21, pp. 4–6.

2.    *Chad Wesner*

Defendant Chad Wesner is a mechanical engineer with twenty-five years of experience in the industry and was an applications engineer at Wendt. Ex. G, 7:5–11:19, 150:11–12. When 3M acquired Wendt, Wesner became a Key Account Manager responsible for managing and going after the gear-grinding market in North America and supporting Mexico on the technical side of the business. *Id.* 11:10–13:6.

Wesner's longtime friend Ian Bennett was working at CDT, and at some point, Wesner reached out to CDT about a job opportunity. *Id.* 42:24–44:2. Wesner resigned from 3M on June 8, 2021, effective June 24, 2021. *Id.* 60:6–62:1; *id.* Dep. Ex. 2, ECF Nos. 96-7/107-4/133-2, p. 20. In his resignation letter, Wesner informed 3M that he would be working for CDT,

---

120-1/124-35, p. 7. The spindle company is not referenced elsewhere in the parties' briefs or fact statements.

[12] The April 30, 2021 email does not reference any customer. Ex. 121, Christy_CDT_051023–24, ECF Nos. 120/136-21, pp. 14–15. The April 19, 2022 email from Keene to CDT management, copying the contractor, Christy, and others at CDT, concerns Keene's meeting with a customer but not Christy asking the contractor to conduct tests. *Id.* Christy_CDT_035529–30, ECF Nos. 120/136-21, pp. 8–9. The July 2022 emails between Vardaman and Keene discuss only why CDT does not need a sales representative for a customer quote. *Id.* Christy_CDT_048008–11, ECF Nos. 120/136-21, pp. 10–13.

described the position, and offered his assistance to 3M, stating he was "willing to help out in the transition, whatever is necessary." *Id.* Dep. Ex. 2, ECF Nos. 96-7/107-4/133-2, p. 20. On June 10, 2021, 3M informed Wesner 3M would not consent to him working for CDT. *Id.* Dep. Ex. 3, ECF Nos. 96-7/107-4/133-2, p. 21.

Wesner's initial focus at CDT was Mexico, as well as providing some support for U.S.-based customers. *Id.* 52:13–24; *id.* Dep. Ex. 1, ECF Nos. 96-7/107-4/133-2, p. 18. Wesner testified that, on behalf of CDT, he has not called on any of the accounts he had at 3M in the last three years of his employment at 3M. *Id.* 104:13–21. However, he did call on former 3M accounts, such as Eaton and Engicom, on behalf of CDT that he had serviced *prior* to the last three years of his employment with 3M. *Id.* 103:2–4, 104:13–24.

As for Eaton, Wesner testified that he did not service Eaton for 3M from 2019 through 2021. Ex. 27, 19:15–24, ECF Nos. 135-7/136-10. In 2019, while defending his performance to his new 3M supervisor during his annual review, Wesner said, "Peter, I had the largest growth account in all of PG&F for the entire globe," which was the Eaton account, and he testified that "this is going back to 2018." *Id.* 38:21–40:4.

As for Engicom, Wesner testified he had not worked with Engicom at 3M since 2015 or 2016 and that a different team was handling the account from 2019 through 2021. *Id.* 19:25–21:23. Shortly after joining CDT, Wesner said in an email: "I asked Vianney to tell the distributor that I have a long relationship with Engicom and inform them I will deal direct with Engicom and schedule the test." *Id.* 133:2–11. He testified that, for Engicom, "I knew the specs and I knew what the pricing was a long time ago . . . ." *Id.* 134:18–22. Wesner confirmed that he was "successful in getting that work for CDT" related to the Engicom quote. *Id.* 136:2–7. CDT was competing against 3M, Engicom's then-current supplier for the wheels. Ex. 109, CDT_1874, ECF Nos. 119-8/124-25, p. 3; Ex. 27, 130:21–131:9, ECF Nos. 135-7/136-10. When asked if

Wesner called on Engicom within the last three years of his employment with 3M, 3M's 30(b)(6) deponent testified, "Not that I know of, no." Ex. 3, 149:18–25, ECF No. 135-1.

Regarding other former 3M customers, from 2017 through when he left 3M in 2021, Wesner was the key account manager for Ford Livonia, Chrysler Kokomo, Linamar (Mexico), and Tremec (Mexico). Ex. 27, 24:7–26:11, ECF Nos. 135-7/136-10. 3M asserts that Wesner "contacted or worked for projects involving" each of these customers after starting with CDT, providing as support only a string citation to the following evidence. Resp. SOAF ¶ 73.

For Ford Livonia, Wesner testified that he contacted an individual on September 30, 2021, who worked for Ford. Ex. 27, 114:21–115:24, ECF Nos. 135-7/136-10; Ex. 23, Dep. Ex. 13, ECF No. 114-11, p. 3. However, Wesner testified that he did not meet with the individual on behalf of CDT, explaining that the individual was not at Ford Livonia but was at Ford Cleveland, he and the individual had become close, the individual was moving to the west coast, and he wanted to have dinner with the individual to thank him and wish him well. Ex. 27, 115:22–116:25, ECF Nos. 135-7/136-10; Ex. V, 117:1–18, ECF Nos. 146-10/155, p. 98.

For Linamar, 3M cites a reference in an email chain from Keene on October 12, 2021: "We need to provide [Wesner] with a quote for his testing at Engicom next week, selling direct to Engicom/Linamar." Ex. 23, Dep. Ex. 15, p. 1, ECF Nos. 114-11/136-7, p. 9.

For Tremec, with whom CDT already had a relationship, Wesner testified that he went to Tremec once while at CDT to test a product that 3M does not make for a sale that was made by another CDT employee. Ex. 27, 107:13–108:22, ECF Nos. 135-7/136-10. In March and April 2022, Wesner emailed with Keene and Orozco at CDT providing advice about the testing. Ex. 25, pp. 655, 658–59, ECF Nos. 135-6/136-9, pp. 17, 20–21.

For Chrysler Kokomo, 3M asserts that "Wesner appears to have assisted Keene and Christy with an arbor repair for Chrysler Kokomo." Resp. SOF ¶ 73, ECF Nos. 112/128 (citing

SOAF ¶ 240); *see also* SOAF ¶¶ 238–39. The cited exhibits show that, on March 31 and April 7, 2021, while still working for 3M, Wesner provided drawings to an individual at 3M's customer, FCA Group (now Stellantis). Ex. 24, Christy_CDT_010691, 010689, 010773, ECF Nos. 135-5/136-8, pp. 23, 30, 34; Ex. 115, Christy_CDT_010689, 010691, ECF Nos. 119-14/136-20, pp. 2, 5. On April 15, the day before *Christy* began working for CDT, the individual sent an email to Christy at his Gmail account. Ex. 24, Christy_007713, ECF Nos. 135-5/136-8, p. 3. Later that day, Wesner[13] texted Christy about a request from the same individual, and Christy said he was going to the outside contractor's place on Monday morning. Ex. 111, ECF Nos. 135-17/124-27; Ex. W, 213:1–2. The next day, Christy forwarded the Stellantis email to his CDT email. Ex. 24, Christy_007713, ECF Nos. 135-5/136-8, p. 3. On April 19, Christy texted photos of the arbor to the outside contractor. Ex. 112, ECF Nos. 119-11/136-19. On April 26, the outside contractor forwarded to Christy at CDT a grinding arbor drawing with an FCA label and x-rays of the arbor, both of which originally came from Christy's 3M email in October 2020. Ex. 113 (Dep. Ex. 15), ECF Nos. 119-12/121-30; Ex. 114 (Dep. Ex. 17), ECF Nos. 119-13/121-31. Christy testified that, although he did not remember, he did not think the x-rays were "anything 3M related" and that it might have been a personal matter. Ex. W, 215:1–216:15.[14] Over a year later in May 2022, the individual from Stellantis forwarded the drawings to Keene at CDT, and Keene asked Christy to open them and email them back. Ex. 24, Christy_CDT_010691, 010689, 010773, ECF Nos. 135-5/136-8, pp. 23, 30, 34; Ex. 115, Christy_CDT_010689, 010691, ECF Nos. 119-14/136-20, pp. 2, 5. In July 2022, Christy asked CDT to draft a quote for Stellantis for arbor repairs, noting

---

[13] Although the individual texting with Christy is identified in the exhibit only by a cell phone number, the exhibit is "Wesner_120406" and the Defendants do not dispute that Wesner was texting Christy.

[14] The Defendants also cite his testimony regarding a Deposition Exhibit 16, *see* Ex. W, 213:3–13, but do not identify Deposition Exhibit 16 in the record.

that CDT had repaired one of the arbors the year before. Ex. 116, Christy_CDT_049715, ECF Nos. 119-15/124-30.

To assert that Wesner assisted Keene in Mexico, 3M cites generally, with no explanation, 49 pages of emails from November 2021 through May 2022. SOAF ¶ 233, ECF Nos. 112/128 (citing Ex. 25, ECF Nos. 135-6/136-9). These emails show that Wesner assisted with testing at Tremec as discussed above. Ex. 25 at 655, 658–59, ECF Nos. 135-6/136-9, pp. 17, 20–21.

*3.    Timothy Keene*

Defendant Timothy Keene started working for the predecessor companies to Wendt in the 1970s, then worked for Wendt, Winterthur, and ultimately 3M. Ex. 68, 9:13–10:16, ECF Nos. 135-12/123-26. While Keene was working in sales for Wendt, the company asked him to move his office and files to his home basement. Ex. 68, 14:3–15:11, ECF Nos. 117-2/136-23.[15] During a basement remodel, Keene threw away old files but kept those for his active clients, including approximately four bankers' boxes worth by the end of his employment with 3M. *Id.* 23:6–24:24, 26:10–29:12.

On January 12, 2021, 3M informed Keene, a 40-year employee, that his employment was being terminated as part of a workforce reduction of 6,000 employees. Ex. A, 136:8–14, 219:24–220:3; Ex. 68, 123:5–8, ECF Nos. 135-12/123-26. Keene did not talk to CDT about employment prior to learning he was being fired. Ex. 68, 124:4–16, ECF Nos. 135-12/123-26. On January 21, Giacherio, at Consort Precision Diamond, responded to a text from Vardaman about Keene and said, "He will be looking to burn 3M to the ground now." Ex. 79, ECF Nos. 117-13/124-3.

---

[15] Although 3M refiled Exhibit 68 at ECF No. 135-12 (16 pages), it did not include page 14, 15, and 22–29 from the original Exhibit 68 filed at ECF No. 117-2 (75 pages). The Court considers those pages from the original filing because the Defendants cite them in their response to 3M's Statement of Additional Facts. *See* Resp. SOAF ¶ 185, ECF No. 146. Notably, 3M later included those pages when Exhibit 68 at ECF No. 123-26 (15 pages) was replaced with Exhibit 68 at ECF No. 136-23 (75 pages).

While recruiting Keene, Vardaman wrote in a February 22 email, "I feel our business[es] coexist very well along with the valuable people and resources you have, this could be the Dream Team on creating a hell of a run." Ex. 76, ECF Nos. 117-10/121-23. On February 23, Viggiano emailed Keene and asked him for a salary suggestion. Ex. 66, ECF Nos. 117/123-24. On March 10, Keene notified 3M of his intent to join CDT and asked to be released from his non-compete agreement. Ex. 86, ECF Nos. 118-4/121-27. In a March 12 email to Keene, Viggiano wrote: "A birdy told me that 3M has a large 14 x 1 inch resin bond customer that they make many many wheels for, maybe that would be a good target if you know who it might be?" Ex. 80, ECF Nos. 117-14/124-4. On March 15, 3M granted Keene the waiver with the stated expectation that Keene would honor the confidentiality provisions of the 3M Employee Agreement. Ex. 86, ECF Nos. 118-4/121-27.

Emails from Keene's personal Gmail account to Vardaman and Viggiano in February 2021 show the name "Max Packard" in the "From" line and a username that contains "packardmax" and a number. Ex. 76, ECF Nos. 117-10/121-23. Keene signed the body of his emails: "Tim Keene." *Id.*; *see also* Ex. 66 ("Tim"), ECF No. 117/123-24. Keene testified that the username is based on the name of his first client, his dog's name, and the year he graduated and that the computer adds the name "Max Packard." Ex. 68, 127:5–12, ECF No. 135-12/123-26. In response to one email, Vardaman wrote, "I almost deleted your email with the code name Max Packard," Ex. 76, and Viggiano started one email to Keene with, "Hey Max ☺," Ex. 66.

On April 16, Vardaman sent Keene at CDT three emails with the subject lines "Vianney – Eaton Emails," "Vianney – GM/WH Tools," "Vianney – Arbormex attached emails" that contained earlier email chains and 3M/Wendt drawings and other documents from 2018 through 2020, some of which discuss 3M/Wendt specifications and many of which originate with customers outside of CDT. *See* Ex. 87, ECF Nos. 118-5/124-7; Ex. 88, ECF Nos. 118-6/124-8,

Ex. 89, ECF Nos. 118-7/124-9. Both Keene and Viggiano testified that it is common for customers to share drawings and that those drawings are used for making quotes. Ex. I, 44:8–20, ECF No. 96-9; Ex. B, 332:3–25. Regarding CDT part numbers and other information in a customer's document, Keene testified, "[I]f 3M would look at this, they wouldn't know anything about that specification just like, yeah, if you look at 3M specifications, it is hard to decipher what are those specifications. It's everybody thinks their little code is top secret nuclear code or something like that, so it is hard to tell." Ex. 68, 177:18–180:3, ECF Nos. 135-12/123-26.

On May 14, 2021, Keene executed a declaration for CDT that "he [had] permanently deleted or destroyed any 3M Confidential Information, as defined in my employment agreement with 3M, I retained after my employment ended with 3M." Ex. 55, ECF Nos. 116-14/121-16. However, some 3M documents may have remained in his files. One document was an undated "PG&F NA SWOT Analysis" that includes references to 2017–2018 and lists strengths, weaknesses, opportunities, and threats in the marketplace. Ex. 6, Keene_008972–73, ECF Nos. 113-6/122-1, pp. 34–35. Some documents were related to Eaton from 2018, some of which included pricing information. *Id.* Keene_009207–14, ECF Nos. 113-6/122-1, pp. 113–120.[16]

In July 2021, Keene asked CDT for purchase orders for rollers at Eaton, with the request "Please expedite! High volume!" Ex. 108, ECF Nos. 119-7/136-18, pp. 3–4. Keene testified that Eaton was not on his list of former 3M customers in the last three years. Ex. 68, 93:6–94:10, ECF No. 117-2/123-26. In an August 19, 2021 email, Keene provided a vendor with the technical drawings for the purchase orders; provided the specifications for how the current supplier, which appears to have been 3M, etches each type of roller for diamond exposure; and

---

[16] 3M cites undated, handwritten notes Keene took on Wendt graph paper and contends, without support, that they are his notes about Eaton while at 3M. *See* SOAF ¶ 229 (citing Ex. 137, at 987, 992, ECF Nos. 120-17/124-44, pp. 2, 7). Keene kept a stack of blank Wendt graph paper that he continued to use for notetaking at CDT. Ex. 68, 11:5–10, 26:18–27:9, ECF Nos. 117-2/136-23.

asked if the vendor could do the same. Ex. 108, ECF Nos. 119-7/136-18, p. 3. The technical drawings he attached for the two diamond rotary dressers were each dated March 9, 2021, labeled "3M Royersford," and were marked as the "confidential property of Wendt Dunnington division of Wendt USA." *Id.* 5, 6. In an August 29, 2021 email, the vendor returned new drawings dated August 29, 2021, with the CDT logo. *Id.* 7, 8. When asked at deposition if the 3M specifications he provided the vendor were 3M's confidential information, Keene testified that it is "not confidential information. That's standard information that they tell their customers how to condition a diamond roller. . . . And there is another e-mail, I don't know if you have it or not, where they say, No problem, we do that. That's standard procedure for them as well." Ex. U, 35:12–18, ECF No. 146-9.

On September 9, 2021, Keene emailed Wirth at CDT, stating, "Here is the Agathon wheel drawing you requested in order to generate quotation. Remember, we want to quote metal bond to compete against 3M and ATI." Ex. 91, ECF Nos. 118-9/124-11/136-17. The technical drawing has yellow rectangles covering the bottom right part of the page. *Id.* Keene testified that he could tell by the font that it was not a 3M drawing and that it could be anybody's drawing, listing several possible companies. Ex. U, 40:20–41:1. As for the reference to "metal bond," Keene explained that it "would be a better wheel than what 3M was using and ATI." *Id.* 41:16–18. He did not recall what 3M was using and testified, "I have no idea because I don't see their specification up there." *Id.* 41:19–21. But he had gone to the plant and saw "a lot of 3M and ATI wheels. And our best bond was metal bond. And I know the 3M product and the ATI product were very good, so I put in metal bond since I knew that was our best." *Id.* 41:23–42:3.

3M contends that Keene "leveraged his relationship with [a] former 3M sales representative . . . to feed him 3M quotes for" a customer. SOAF ¶ 246, ECF Nos. 112/128. 3M offers evidence of a 2018 3M contract with the sales representative, Ex. 123a, ECF Nos. 120-

2/136-22; a 2019 CDT contract with the same sales representative, Ex. 123b, ECF No. 120-3; and July 2022 emails, in which the sales representative emailed Keene and Vardaman asking if CDT was interested in making a proposal for a customer who had contacted him and Keene then told Vardaman that CDT does not need the sales representative to make a quote, Ex. 124, ECF Nos. 120-4/124-37. Both the 2018 3M contract and the 2019 CDT contract list that customer. Ex. 123a, ECF Nos. 120-2/136-22, p. 13; Ex. 123b, ECF No. 120-3, pp. 4–5.

3M notes that, on an "Incoming & Outgoing Report," dated May 31, 2022, Keene made a handwritten note of "+ 30%" at the bottom of the column for "YTD Outgoing." Ex. 129 at 776, ECF Nos. 120-9/124-41, p. 6. When asked at his deposition what "wins" he "had in that first year [he] was with CDT," Keene responded, "The only one I can remember is a company called Engicom. For actual wins for Vit CBN, there was some existing business that had grown since I had started with them, business that they had, so I won't mention them." Ex. U, 47:21–48:4.

### D.    3M "Former Employees"

The 3M "Former Employees" are the following individuals who now work for CDT: Troy Giacherio, Ian Bennett, Vianney Flores, Ben Fisher, Ricardo Reyes, Don Cutchell, John Hajduk, Hugo Orozco, Keene, Christy, and Wesner. Am. Compl. ¶ 22; Ex. J at 3–4, ECF No. 96-10; Ex. K at 4, ECF No. 96-11.

Christy ran into Orozco at a hotel when they were both interviewing with CDT. Ex. 33, 200:17–201:5, ECF Nos. 135-9/123-2. Christy later called Orozco to say that it had been good to see him. *Id.* 205:18–20. When Orozco asked about CDT, Christy said it seemed liked a pretty good company to work for. *Id.* 205:21–23. Christy then texted Vardaman regarding the call, stating that he "called [Orozco], just gave him some encouragement [CDT's] way. He sound[ed] a little nervous about cutting the cord from 3M." *Id.* 204:24–205:11. The "encouragement" was the statement that CDT "seems like a good company to work for." *Id.* 205:24–206:8.

A few years earlier, Orozco interviewed with CDT and asked Wesner about it; Wesner responded that his friend liked working at CDT but he would hate to see Orozco leave 3M. Ex. G, 162:13–163:9. On March 9, 2022, Rodrigo Torres texted Wesner to tell him that Orozco quit his job at 3M, to which Wesner responded, "Don't say anything" and "We talk in private later," to avoid spreading rumors. Ex. 45, ECF No. 116-4; Ex. G, 164:3–13.

### E.    3M's Trade Secrets

James McGinnis—employed by 3M for over 41 years mainly in product management and operations for PG&F and currently the Operations Manager for 3M's facility in Royersford, Pennsylvania, where 3M manufactures superabrasives—identifies and describes 3M's trade secrets at issue in this litigation in each of nine categories. McGinnis Decl. ¶¶ 1, 23; *see* SOAF ¶¶ 139–171, ECF Nos. 112/128, pp. 49–62.[17]

**Trade Secret 1: 3M Superabrasive Technical Drawings**

3M's superabrasive technical drawings are 3M trade secrets. McGinnis Decl. ¶ 24. 3M's technical drawings for its superabrasive products contain proprietary information about 3M's products, including dimensions, specifications, tolerances, and other technical details. *Id.* McGinnis identifies two categories of such drawings at issue, with some examples: (1) technical drawings of 3M grinding wheel and rotary dresser products and their component parts and (2) technical drawings of 3M spindle products and their component parts. *Id.* ¶¶ 25(a), (b) (citing Ex. 136, 3M_032044, ECF Nos. 120-16/121-39; Ex. 130, 3M_032001–37, ECF Nos. 120-10/121-35).

**Trade Secret 2: Superabrasive Product Designs, Specifications, and Formulas**

---

[17] McGinnis also provides information about the value of each trade secret, the efforts 3M takes to protect the confidentiality of the information, and how the trade secret is not generally known or readily ascertainable. These facts are beyond the scope of the legal issue on this motion as to Counts II and III.

3M invests substantial time and resources to develop product designs, specifications, and formulas. McGinnis Decl. ¶ 26. This includes employing, training, and managing a technical workforce that includes specially trained process engineers and materials scientists. *Id.* These 3M employees design, develop, test, and refine products, including grinding wheels, that address specific customer needs and applications. *Id.* This process requires years of iterative refinement and is continually updated as additional customer feedback is received and incorporated into the engineering process. *Id.* McGinnis then gives detailed information at issue in this case about how 3M records and maintains reference to these custom designs with examples. *Id.* ¶¶ 27–32 (citing Ex. 12, 3M_1305, 3M_001727–42, ECF Nos. 114/122-5, pp. 22, 90–105).

**Trade Secret 3: 3M Superabrasive Testing/Validation Processes and Results**

3M's testing/validation processes and results for its superabrasive products are trade secrets. *Id.* ¶ 34. 3M conducts tests to understand and improve the performance of its superabrasive products, including grinding wheels. *Id.* McGinnis identifies the at-issue trade secret as the testing results of 3M's grinding wheels, identifying specific results and providing examples. *Id.* ¶ 35 (citing as examples Ex. 12 at 3M_001312–3M_001316, 3M_001726–3M_001742, ECF Nos. 114/122-5, pp. 29–33, 89–105).

**Trade Secret 4: 3M Superabrasive Contractor Information**

McGinnis identifies two outside contractors that 3M uses. *Id.* ¶¶ 36, 37. 3M offers evidence that the contractors are subject to confidentiality obligations. Ex. 131, ECF Nos. 120-11/121-36; Ex. 132, ECF Nos. 120-12/121-37/134-5. The identity of the two contractors, the customers they work with on behalf of 3M, and the work they perform are all confidential information to 3M. McGinnis Decl. ¶ 38.

**Trade Secret 5: 3M Superabrasive Original Equipment Manufacturer (OEM) and Sales Representative Information**

3M has developed proprietary and confidential sales and marketing strategies to effectively target PG&F markets around the world, which McGinnis describes. *Id.* ¶¶ 39, 40. McGinnis identifies by name thirteen OEMs and distributors and states that the identity of the OEMs and distributors, the customers they work with, and the work they perform is 3M confidential information. *Id.* ¶¶ 40, 41.

**Trade Secret 6: 3M Superabrasive Key Customer Information**

Information about 3M's key customer contacts and their preferences is valuable to 3M because it allows 3M to maintain its hard-earned competitive position within the superabrasives market and develop important customer relationships. *Id.* ¶ 42. The products are usually custom-made, tailored to the specific needs and preferences of the specific customer. *Id.* 3M uses Salesforce software to track and analyze customer interactions, develop its sales strategy, and continuously improve its customer relationships. *Id.* ¶ 44. Critical information relevant to 3M's sales strategy is maintained in its Salesforce database, and 3M limits access to that database on a "Need to Know" basis. *Id.* McGinnis identifies the at-issue 3M trade secrets as the key customer contacts and customer preferences from their ordering history of 53 named customers. *Id.* ¶ 46. CDT argues that 3M has not offered any documents or evidence of what the trade secrets are for each of these customers. The Court finds that the identification of the customer is sufficient to identify which order history is alleged to be a trade secret for purposes of the instant motion.

**Trade Secret 7: 3M's Superabrasive Trade Secret Pricing Information**

3M's pricing information is valuable to 3M because it reflects proprietary information about 3M's marketing and commercialization efforts and allows 3M to maintain its position within the superabrasives market. *Id.* ¶ 47. Disclosure to 3M's competitors of the information that goes into determining 3M's final prices, as described in more detail in McGinnis' declaration, would provide the competitors with a competitive advantage they do not currently

have. *Id.* ¶¶ 47–48. The at-issue 3M superabrasive trade secret pricing information includes the actual and projected pricing schemes for its custom products, as described by McGinnis. *Id.* ¶ 49.

**Trade Secret 8: 3M's Forward-Looking Business Plans and Forecasts for the Superabrasive Business**

3M's forward-looking business plans and forecasts reflect proprietary information about 3M's marketing and commercialization efforts and are formulated to enable 3M to maintain its position within the superabrasives market. *Id.* ¶ 50. Disclosure of this information to 3M's competitors would provide them with a roadmap to competing with 3M in the market, thereby giving 3M's competitors a competitive advantage. *Id.* Even after the information becomes out of date, the information, if provided to a competitor, would confer an economic benefit from the insight into 3M's marketing and commercialization efforts for customers. *Id.* As the at-issue trade secret information in this case, McGinnis lists 3M SWOT analyses, industry analyses, business plans, and financial reports and results. *Id.* ¶ 51. However, neither McGinnis nor 3M identifies any specific 3M SWOT analyses, industry analyses, business plans, or financial reports and results at issue in this case. Thus, 3M has failed to identify with specificity any such trade secrets.

**Trade Secret 9: Compilation of the Trade Secrets 1–8**

McGinnis states that the information identified as Trade Secrets 1–8, in addition to being individual trade secrets, are also a trade secret when compiled. *Id.* ¶ 52. However, neither McGinnis nor 3M offers any at-issue compilations. Thus, 3M has failed to identify with specificity any compilations as trade secrets.

## ANALYSIS

The Defendants move for summary judgment on Counts I through IV of the Amended Complaint, and Defendant Wesner moves for partial summary judgment on Count V.

**A.      Tortious Interference with Contract (Count I)—the 3M Employee Agreements**

Count I for tortious interference with contract alleges that CDT and the Individual Defendants knew about the 3M Employee Agreements, "interfered with . . . the Former Employees' contractual obligations to 3M" with the intent to harm 3M, and "intentionally procured the breach of these contractual obligations by recruiting and hiring the Former Employees who worked at 3M" to "(a) use 3M's confidential information for the benefit of CDT, (b) solicit their former 3M colleagues to join them at CDT, (c) develop, manufacture, market, or service competing products, or (d) call on their former sales accounts while with 3M." Am. Compl. ¶¶ 74–76. 3M alleges that the interference is "improper and without justification." *Id.* ¶ 77. The group of "Former Employees" are Christy, Wesner, Keene, Giacherio, Bennett, Fisher, Flores, Reyes, Cutchell, Hajduk, and Orozco.

"Indiana has long recognized that intentional interference with a contract is an actionable tort, and includes an intentional, *unjustified interference by third parties* with an employment contract." *Haegert v. McMullan*, 953 N.E.2d 1223, 1233 (Ind. Ct. App. 2011) (quoting *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994)). The tort has five elements: (1) the existence of a valid and enforceable contract; (2) the defendants' knowledge of the existence of the contract; (3) the defendants' intentional inducement of breach of the contract; (4) *the absence of justification*; and (5) damages resulting from the defendants' wrongful inducement of the breach. *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 214 (Ind. 2019) (citing *Winkler*, 638 N.E.2d at 1235) (emphasis added).

*1.      Defendant CDT*

Defendant CDT moves for summary judgment solely on the basis that 3M cannot show an absence of justification, arguing that CDT's conduct was justified because CDT and 3M are business competitors in the superabrasives industry. The Indiana Supreme Court has cited the

Restatement (Second) of Torts § 767 for the following seven factors to consider in determining

whether a defendant's conduct in intentionally interfering with a contract was justified:

> (a) the nature of the defendant's conduct;
> (b) the defendant's motive;
> (c) the interests of the plaintiff with which the defendant's conduct interferes;
> (d) the interests sought to be advanced by the defendant;
> (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;
> (f) the proximity or remoteness of the defendant's conduct to the interference; and
> (g) the relations between the parties.

*Winkler*, 638 N.E.2d at 1235 (quoting Restatement (Second) of Torts § 767 (1977)); *see Haegert*,

953 N.E.2d at 1234 (quoting *Winkler*, 638 N.E.2d at 1235); *Levee v. Beeching*, 729 N.E.2d 215,

221 (Ind. Ct. App. 2000). "[T]he weight to be given to each consideration may differ from case

to case depending on the factual circumstances." *Winkler*, 638 N.E.2d at 1235; *see* Restatement

(Second) of Torts § 767 cmt. b ("The decision therefore depends upon a judgment and choice of

values in each situation."). Nevertheless, "the overriding question is whether the defendant['s]

conduct has been fair and reasonable under the circumstances." *Winkler*, 638 N.E.2d at 1235

(citing Restatement (Second) of Torts § 767, cmt. j); *see Haegert*, 953 N.E.2d at 1234 (citing

*Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 252 (Ind. Ct. App. 2001));

*Levee*, 729 N.E.2d at 221 (citing *Winkler*, 638 N.E.2d at 1235).

CDT contends that 3M must also show that "the breach [was] malicious and exclusively

directed to the injury and damage of another," which has been required by some panels of the

Indiana Court of Appeals. *See, e.g.*, *Haegert*, 953 N.E.2d at 1234–35 (quoting *Bilimoria Comput.*

*Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 156–57 (Ind. Ct. App. 2005)); *Bragg v. City of*

*Muncie*, 930 N.E.2d 1144, 1147–48 (Ind. Ct. App. 2010) (same); *Morgan Asset Holding Corp. v.*

*CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000) (citing *Winkler v. V.G. Reed & Sons,*

*Inc.*, 619 N.E.2d 597, 600–01 (Ind. Ct. App. 1993)). However, other appellate panels have not

adopted this standard, instead following the Indiana Supreme Court in *Winkler*[18] by applying the

seven Restatement factors and considering whether the defendant's conduct was fair and

reasonable under the circumstances:

> Nowhere in its opinion [in *Winkler*] did our supreme court discuss or even suggest
> that a malicious standard . . . was the appropriate standard with which to analyze
> the absence of justification. The supreme court's analysis clearly dictates that the
> overriding question in determining whether there is an absence of justification is
> whether the defendant's conduct was fair and reasonable under the circumstances.
> *Winkler*, 638 N.E.2d at 1235. This determination is reached by considering the
> seven Restatement factors. The mere fact that our supreme court considered that
> Winkler did not allege that the defendants' actions were *malum in se* or a spiteful
> attempt to injure is insufficient reasoning for us to adopt the malicious standard as
> Coke USA argues.

*Coca-Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 51 (Ind. Ct. App. 2004) (declining to

follow *Morgan Asset Holding Corp.*, 736 N.E.2d at 1272), *vacated on other grounds*, 841 N.E.2d

557, 560 (Ind. 2006);[19] *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 120 (Ind. Ct. App. 2008)

(citing the Supreme Court's standard in *Winkler* and declining to require that the defendant have

acted maliciously or with ill will); *see also Guinn v. Applied Composites Eng'g, Inc.*, 994 N.E.2d

1256, 1267 (Ind. Ct. App. 2013) (relying on the seven Restatement factors and the "fair and

reasonable under the circumstances" test set forth by the Supreme Court in *Winkler* with no

discussion of a malice standard (citing *Allison*, 883 N.E.2d at 118)); *Beanstalk Grp., Inc. v. AM*

---

[18] Although the Indiana Court of Appeals in *Winkler* applied the malice standard, *see Winkler v. V.G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600–01 (Ind. Ct. App. 1993), the Indiana Supreme Court did not adopt the standard on transfer, *see Winkler*, 638 N.E.2d at 1235–36.

[19] On transfer, the Indiana Supreme Court summarily affirmed the Court of Appeals' decision on this issue. *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 841 N.E.2d 557, 560 (Ind. 2006); *see* Ind. App. R. 58(A)(2) (establishing that portions of a Court of Appeals' opinion that are "summarily affirmed . . . shall be considered as Court of Appeals' authority"). Notably, subsequent Indiana Courts of Appeals decisions that define "unjustified" to mean "malicious and exclusively directed to the injury and damage of another" rely on *Morgan Asset Holding Corp.*, which relied on the *Winkler* Court of Appeal decision, but do not discuss the subsequent *Winkler* Supreme Court decision or the Court of Appeals decision in *Coca-Cola. See, e.g.*, *Mourning v. Allison Transmission, Inc.*, 72 N.E.3d 482, 488–89 (Ind. Ct. App. 2017); *Duty v. Boys & Girls Club of Porter Cnty.*, 23 N.E.3d 768, 775 (Ind. Ct. App. 2014); *Miller v. Cent. Ind. Cmty. Found.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014).

*Gen. Corp.*, 283 F.3d 856, 863 (7th Cir. 2002) ("[T]he defendants are wrong to argue that

Indiana requires that the interference be 'malicious'; it's enough if it's intentional and

unjustified." (citing *Winkler*, 638 N.E.2d at 1235; *Zemco Mfg., Inc. v. Navistar Int'l Transp.

Corp.*, 186 F.3d 815, 822–23 (7th Cir. 1999)); *Montgomery v. Lake County*, No. 2:04-CV-49,

2005 WL 8170103, at *3–4 (N.D. Ind. Mar. 11, 2005) (declining to adopt the "malice" standard

from *Morgan Asset Holding Corp.* in light of the *Winkler* Supreme Court decision).[20] More

recently, the Indiana Supreme Court in *American Consulting, Inc.* recognized, but did not

resolve, the question of whether there is a malice standard for proving the absence of

justification. 136 N.E.3d at 215.[21]

Bound by the Indiana Supreme Court's statement of the law in *Winkler*, the Court

declines to impose a separate malice standard. *See Great Am. Ins. v. Lexington Ins.*, 671 F. Supp.

3d 948, 956 (N.D. Ind. 2023) (relying on *Winkler* and declining to apply a malice standard);

*Tyler Techs., Inc. v. Lexur Enters.*, No. 4:20-CV-173, 2021 WL 2661751, at *7–8 (S.D. Ind. June

29, 2021) (same); *Howmedica Osteonics Corp. v. DJO Glob., Inc.*, No. 1:17-CV-938, 2018 WL

3130969, at *5 (S.D. Ind. Mar. 15, 2018) (same); *see also Inst. for Int'l Educ. of Students v. Qian

Chen* (Chen I), 380 F. Supp. 3d 801, 808 (S.D. Ind. 2019).

---

[20] Regarding the origins of the "malice" standard, the Seventh Circuit Court of Appeals explained, "[T]he word 'malicious' does appear in a few cases, such as [*Morgan Asset Holding Corp.*,] but it is apparent that the 'malice' to which it refers, as in the cases that require proof of 'actual malice' in a defamation suit by a public figure, is intentionality rather than ill will." *Beanstalk Grp., Inc.*, 283 F.3d at 863; *see also* Restatement (Second) of Torts § 766, cmt. s.

[21] Because its decision was made under the Indiana state law summary judgment standard, which requires the moving party to prove the non-existence of an element of the non-movant's claim, the Indiana Supreme Court found that, "no matter which of the two standards for what constitutes the absence of justification element" is applied to the facts of the case, summary judgment was precluded because there was evidence both that the defendant had a legitimate business purpose for its conduct and that the defendant targeted the plaintiff for an improper purpose. *Am. Consulting*, 136 N.E.3d at 215; *see Winkler*, 638 N.E.2d at 1235 (explaining the burden on summary judgment under Indiana law); *Bell v. Walmart, Inc.*, No. 1:21-CV-368, 2023 WL 6307763, at *1 (N.D. Ind. Sept. 27, 2023) (recognizing that, in contrast with the Indiana state law standard, a party seeking summary judgment under the federal standard "is not required to negate the non-movant's claim" (citation omitted)).

In its motion for summary judgment, CDT argues that its conduct in hiring 3M's Former Employees was justified as proper interference because CDT and 3M are business competitors in the superabrasives industry. Comment a to the Restatement (Second) of Torts § 767 provides: "Section 768, following this Section, deals specifically with the question of whether competition is a proper or improper interference with contractual relations, either existing or prospective." Restatement (Second) of Torts § 767, cmt. a. Thus, courts analyze the element of absence of justification for business competitors under Restatement (Second) of Torts § 768, titled "Competition as Proper or Improper Interference," which provides in relevant part:

> (1) One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
> > (a) the relation concerns a matter involved in the competition between the actor and the other and
> > (b) the actor does not employ wrongful means and
> > (c) his action does not create or continue an unlawful restraint on trade and
> > (d) his purpose is at least in part to advance his interest in competing with the other.

*Rice v. Hulsey*, 829 N.E.2d 87, 91 (Ind. Ct. App. 2005) (quoting Restatement (Second) of Torts § 768 (1977); citing *Harvest Life Ins. v. Getche*, 701 N.E.2d 871, 877 (Ind. Ct. App. 1998)). Thus, when "a defendant offers competition as purported justification for tortious interference, Indiana courts, following the Restatement, do not deem the interference justified if the defendant employed wrongful means." *Inst. for Int'l Educ. of Students v. Chen* (Chen II), No. 1:18-CV-2229, 2020 WL 4504903, at *10 (S.D. Ind. Aug. 5, 2020) (citing *Rice*, 829 N.E.2d at 91; *Harvest Life Ins.*, 701 N.E.2d at 877; *Computs. Unltd. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 169–70 (Ind. Ct. App. 1995)); *see Tyler Techs.*, 2021 WL 2661751, at *8.

For "wrongful means," first discussed in the comments to § 767, "[t]he issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it[,]" and "the propriety [of the means] is

42

determined in light of all the factors present." Restatement (Second) of Torts § 767, cmt. c (discussing several predatory means that are "ordinarily wrongful"). The comments to § 768 on business competition adopt the same analysis: "The predatory means discussed in § 767, Comment *c*, [such as] physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section [§ 768]. On the other hand, the actor may use persuasion and he may exert limited economic pressure." Restatement (Second) of Torts § 768 cmt. e (discussing the importance and role of competition to free enterprise).

Finally, comment i to § 768 addresses the business competition justification for interference with an at-will employment contract that is subject to non-compete provisions, such as the 3M Employee Agreements in this case. "[The competitor] may offer better contract terms, as by offering an employee of the plaintiff more money to work for him . . . , and he may make use of persuasion or other suitable means, all without liability." Restatement (Second) of Torts § 768 cmt. i. However, an employment contract is only "partially terminable at will" when it

> leave[s] the employment at the employee's option *but provide[s] that he is under a continuing obligation not to engage in competition with his former employer*. Under these circumstances a defendant engaged in the same business might induce the employee to quit his job, *but he would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete*.

*Id.* (emphasis added).[22] Thus, § 768's reference to at-will employment "should not be extended to permit *any* interference with an at-will employee's contract such as inducing that employee to divulge confidential information or to undermine his employer's best interests." *Europlast Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1274 (7th Cir. 1993) (discussing § 768 comment i); *see, e.g.*, *CGB Diversified Servs., Inc. v. Baumgart*, 504 F. Supp. 3d 1006, 1023–24 (E.D. Mo. 2020) (recognizing that "[c]ourts have found that aiding the violation of restrictive covenants

---

[22] While the Court has not found an Indiana state court opinion on § 768 comment i, Indiana courts have applied § 768 and its comments as discussed above.

constitutes independently wrongful actions sufficient to state a claim for tortious interference"
(citing *BlueLine Rental, LLC v. Rowland*, No. 1:18-CV-195, 2020 WL 1915252, at *4 (E.D. Mo.
Apr. 20, 2020); Restatement (Second) of Torts § 768 (cmt. i))).

Here, the Former Employees were at-will employees subject to the non-compete clauses
of their 3M Employee Agreements. CDT argues that justification is established as a matter of
law because hiring the Former Employees advances CDT's business interest in competing
against 3M and others. CDT testified it was interested in then-3M employee Paul Christy
because he is knowledgeable, a "good mechanical guy," and had gained experience with
diamond tools because of his prior work with spindles. And CDT notes that 3M's Amended
Complaint even alleges that CDT wanted to assemble a "Dream Team" and make "a hell of a
run," Am. Compl. ¶ 71, which is a permissible business competition justification for the
interference. CDT contends that 3M has provided no evidence of "wrongful conduct" by CDT in
meeting that goal by hiring the Former Employees.[23]

It is undisputed that CDT's hiring of the Former Employees was related to advancing its
interest in competing with 3M. The issue is whether CDT recruited the Former Employees by
"wrongful means" or "in an activity that would mean violation of the contract not to compete."
Restatement (Second) of Torts § 768, § 768 cmts. e, i; *see Chen II*, 2020 WL 4504903, at *10
(denying summary judgment on the tortious interference with business relationships claim on
"absence of justification" because a rational trier of fact could find that defendants employed
wrongful means when the defendants induced two employees to work surreptitiously for them

---

[23] In support, CDT cites *Konecranes, Inc. v. Davis*, which dismissed the plaintiff's tortious interference
with contract claim because the allegations of absence of justification were conclusory and contradicted
several other allegations of legitimate business competition. No. 1:12-CV-1700, 2013 WL 1566326 (S.D.
Ind. Apr. 12, 2013). *Konecranes* is distinguishable both as a ruling on a Rule 12(b)(6) motion to dismiss
and because the contracts at issue on the claim were with non-party customers of the plaintiff and not the
former employee's employment agreement. *Id.* at *2–3.

while still on the plaintiff's payroll). 3M has offered no evidence that CDT employed wrongful means in recruiting the Former Employees such as the predatory means of physical violence, fraud, civil suits, or criminal prosecutions. And 3M cites no evidence that Vardaman saying he liked "the idea of 1 last attempt to steal the sinking ship of 3M" referred to hiring the Former Employees. That statement appears to be in response to an email earlier that day that Viggiano thought it was worth "taking another run at 3M and *purchase* them." Yet 3M offers evidence to create a genuine dispute of material fact that CDT recruited Christy and Keene to do some work in violation of the non-compete provisions of their 3M Employee Agreements.

First, 3M offers evidence creating a reasonable inference that Christy used a 3M spindle drawing to have a superabrasives contractor produce a CDT spindle for CDT to sell to customers. In October 2020 while at 3M, Christy sent a confidential drawing of the 3M ASSM, MK2 cantilever spindle (drawing number D8377-11) to a 3M original equipment manufacturer (OEM A). In late January 2021, while Christy was still at 3M, a CDT employee texted Vardaman: "Had dinner with Paul Christy tonight and he has expressed an interest in CDT. He is the dresser spindle guy." While being recruited by CDT in February 2021, Christy emailed Vardaman that he "would love to eventually get you guys into the dressing system business."

Then, in June 2021, while working for CDT, it appears that Christy emailed a superabrasives contractor (whom 3M also used) the same confidential 3M drawing he had sent to OEM A in October 2020. On December 6, 2021, OEM A emailed Christy asking whom to contact at 3M about the "3M MK II" spindle;[24] later that evening, Christy sent a blank email back to OEM A. On December 15, Christy emailed Wesner item descriptions for a "buy out" from a supplier, including a CDT Series 2 Cantilever Style Rotary Dresser Spindle. There is a

---

[24] That same afternoon, Wesner emailed Viggiano, Vardaman, and Keene with information for CDT to get started in the spindle business.

specification drawing of a CDT Series 2 Cantilever Style Rotary Dresser Spindle dated

December 15, 2021. The next day, Wesner asked CDT to prepare a quote for OEM A for the buy

out, stating that the CDT Series 2 Spindle would be purchased from the superabrasives

contractor to whom Christy had emailed the 3M ASSM, MK2 cantilever spindle drawing in

June. And in February 2022, Wesner sent an email to a different customer with drawings of the

"ST II spindle," stating that CDT had supplied the spindle to another customer.

Second, 3M asserts that CDT permitted Individual Defendants Christy and Wesner to

continue servicing their 3M accounts in violation of the 3M Employee Agreement. Resp. 5, ECF

Nos. 111/125 (citing Resp. SOF ¶¶ 70 (Christy: SKF, P&W, USACH Hardinge, and Timken

Lebanon), 73 (Wesner: Ford Livonia, Linamar, Tremec, Chrysler Kokomo, Eaton, and

Engicom)). The cited evidence is only sufficient to survive summary judgment as to Christy for

former 3M customers SKF (Kaydon Sumter), P&W, and USACH Hardinge.

For SKF, Christy testified that SKF was not his 3M customer; however, SKF sent him a

dresser replacement parts request at 3M in February 2020, which Christy forwarded within 3M,

and 3M generated a quotation, copied to Christy. A year later, still at 3M, Christy emailed SKF

with the same subject line as the 3M quotation email a year earlier, stating he would be in their

area and asking if they needed anything. Once Christy was at CDT, an outside sales

representative emailed SKF that Christy was interested in working on their diamond rolls and

then emailed Christy with information in the event CDT wanted to provide the quotation for

SKF. For P&W East Hartford, Christy was contacted at 3M in February 2021 about purchasing a

diamond grinding wheel; once at CDT, Christy went to the P&W East Hartford facility to do

technical support. For USACH Hardinge, Christy made a call as a 3M salesperson for dressing

systems in support of another 3M salesperson; when he was at CDT, he received an email from

USACH Hardinge with technical questions about the 3M MK III dressing spindle, and he

responded with specific answers. Finally, although Timken Lebanon was a former 3M customer of Christy's, 3M identifies no evidence that Christy serviced Timken for CDT. *See* Resp. SOF ¶ 70, ECF Nos. 112/128.

For Wesner, the evidence of record does not create a genuine dispute of fact that Wesner serviced his former 3M clients Ford Livonia, Linamar, Tremec, and Chrysler Kokomo in violation of the 3M Employee Agreement once he was at CDT. For Ford Livonia, the evidence is that Wesner met socially with a Ford Livonia employee now working at a different location. For Linamar, the only evidence offered by 3M is an October 12, 2021 email from Keene that references testing that Wesner was doing at Engicom "selling direct to Engicom/Linamar." With no other evidence offered by 3M, this reference is insufficient to raise an inference that Wesner was servicing Linamar. For Tremec, Wesner tested a product for CDT for sale by a different CDT salesperson, but the product is not one made by 3M. For Chrysler Kokomo, 3M's evidence does not support its assertion that Wesner assisted Keene and Christy with an arbor repair by CDT for Chrysler Kokomo. The evidence shows that Wesner provided drawings to a customer while still at 3M, and then the 3M customer shared the drawings with Christy at CDT. The cited text communication between Wesner and Christy was while they both still worked for 3M. There is no evidence from which to infer that Wesner assisted Keene and Christy at CDT.

For Eaton and Engicom, whom Wesner did service at CDT, Wesner did not service them in his last three years with 3M. Wesner last had Eaton as the "largest growth account" in 2018, and he testified that he did not service Eaton from 2019 through 2021. 3M offers no evidence to raise an inference that Wesner serviced Eaton in the last three years of his 3M employment. For Engicom, Wesner testified that he had not worked for them since 2016, and 3M's Rule 30(b)(6) deponent testified that Wesner did not call on Engicom in his last three years at 3M.

Third, in a March 12, 2021 email, Viggiano wrote to Keene, "A birdy told me that 3M has a large 14 x 1 inch resin bond customer that they make many many wheels for, maybe that would be a good target if you know who it might be?" Keene had been fired from 3M in January and was in negotiations to work for CDT. Similarly, on February 17, 2021, Vardaman forwarded to Christy, who was still a 3M employee with Timken as a client, a CDT email chain with "initial feedback from Timken," and wrote, "See below, maybe a nudge from a long-tenured well respected guy might make them give CDT a chance?" Christy responded with what appears to be 3M confidential information about Timken. This evidence supports an inference that CDT was hiring Keene and Christy intending to have them provide 3M confidential information and that CDT was inducing Christy to breach his Employee Agreement while still employed by 3M.

Fourth, just after Keene was hired by CDT, Vardaman emailed him 3M product specifications, which were contained in CDT email chains from 2018 through 2020. Keene testified that companies like CDT and 3M each consider their product specifications to be "top secret nuclear code or something," explaining that the specifications would be hard to decipher. One reasonable inference is that Vardaman emailed Keene the 3M product specifications for Keene to decode and/or use for the benefit of CDT.

The other evidence 3M offers does not support an inference that CDT procured breaches of the Former Employees' 3M Employee Agreements. First, 3M asserts that CDT "created [a] false job description" for Christy. 3M reasons that CDT claimed Christy was a "Senior Product Engineer" providing only "technical support" (since he did not hold that position at 3M where he was in sales) but that at CDT "Christy's job duties [actually] included supporting sales, including through quoting and product testing." Resp. 5, ECF Nos. 111/125. However, the CDT job description includes "support sales through entire quoting and testing process" and "coordinate with sales, engineering, production, and quality to best serve the customer."

Second, 3M asserts that CDT "[k]nowingly communicated with Keene while he was using an alias and was still a 3M employee, referring to him as 'Max Packard'" to suggest that Keene, who was fired from 3M in January 2021, and CDT were attempting to conceal Keene's identity. Resp. 5, ECF Nos. 111/125 (citing SOAF ¶¶ 195, 197). The evidence does not support such an inference as Keene signed the emails with his real name, "Tim Keene" and "Tim"; he testified about how he had chosen his email user name and that the computer populated the "From" line with the name "Max Packard"; and both Vardaman and Viggiano treated the "Max Packard" name with levity (writing, "I almost deleted your email with the code name Max Packard" and "Hey Max ☺").

Third, 3M contends that CDT misappropriated a 3M technical drawing "to produce knockoffs of 3M products and sell them to 3M customers at significant discount," citing only an email exchange between Keene and Wirth about a wheel drawing and competing against 3M and ATI for a customer's business. Resp. 5, ECF Nos. 111/125 (citing SOF ¶ 210 and Ex. 91, ECF Nos. 118-9/124-11). As detailed in Part C(2) below on the claim of unfair competition based on passing off, the cited evidence does not support this factual assertion.

As a final matter, CDT contends that 3M cannot meet the third element of the tortious interference with contract claim—intentional inducement of the breach—based on the following language from *Indiana Health Centers, Inc. v. Cardinal Health Systems, Inc.*:

> [T]he mere fact that [the defendant] hired Dr. Wolfe with knowledge that his employment would violate the Agreement's non-compete clause does not amount to inducement of breach. Although [the plaintiff's] contractual interests under the Agreement were certainly entitled to protection, [the plaintiff] had already been afforded the benefit of such protection through contract law. The trial court did not err in granting summary judgment and thus denying additional protection under tort law.

774 N.E.2d 992, 1001 (Ind. Ct. App. 2002) (cleaned up). *Indiana Health Centers* is distinguishable because the alleged breach was Dr. Wolfe leaving his employment with the

plaintiff to work for the defendant. *Id.* at 998. In contrast, 3M's tortious interference with contract claim is not based on CDT inducing Christy and Keene to leave 3M to work for CDT (it could not be as to Keene because he had been fired by 3M), but on CDT inducing them to violate the non-compete clauses of their 3M Employee Agreements by using 3M confidential information; soliciting their former colleagues; developing, manufacturing, marketing, or servicing competing products; or calling on their former 3M sales accounts.

Accordingly, the Court denies the motion for summary judgment on Count I against CDT as to its alleged tortious interference with the 3M Employee Agreements of Former Employees Christy and Keene and grants summary judgment for CDT as to all other Former Employees.

2.    *Individual Defendants Christy and Wesner*

Individual Defendants Christy and Wesner argue that 3M has no evidence that they interfered with any Former Employees' contracts, and 3M responds only that they were involved with the recruitment of Former Employee Orozco. 3M cites evidence that, after Christy saw Orozco at the hotel where they were both interviewing with CDT, Christy called Orozco to say that CDT seemed like a pretty good company to work for. But as argued by CDT, 3M offers no evidence or argument about how Orozco breached his 3M Employee Agreement (such as violating a non-compete clause) or how Christy's positive statement about CDT induced Orozco's unidentified breach of the agreement. *See Am. Consulting, Inc.*, 135 N.E.3d at 214 (requiring "the defendants' intentional inducement of breach of the contract"). As to Wesner, years earlier when Orozco interviewed with CDT, Wesner told Orozco that a friend liked working at CDT but that he would hate to see Orozco leave 3M. Then in March 2022, while working for CDT, Wesner responded to a text message from a third party about Orozco leaving 3M by telling the third party they would talk in private later. Not only is it unclear how this is even evidence of inducement, there is still no evidence or argument about how Orozco breached

50

his 3M Employee Agreement or how Wesner induced any such breach. *See id.* 3M has failed to create a reasonable inference that "Christy and Wesner conspired with CDT to build a 'dream team' of Former Employees." Resp. 13, ECF Nos. 111/125.[25]

The Court grants summary judgment for Individual Defendants Christy and Wesner on Count I of the Amended Complaint. The claim remains pending against Individual Defendant Keene because the motion makes no legal or factual argument regarding this claim against him.

3.    *Plaintiff 3M Innovative Properties Company*

All counts in the Amended Complaint are alleged by "3M," defined as 3M Company *and* 3M Innovative Properties Company. In their response brief, the Plaintiffs clarify that Count I is brought only by 3M Company. Thus, the Court grants the motion for summary judgment for the Defendants on Count I bought by Plaintiff 3M Innovative Properties Company.

**B.    Misappropriation of Trade Secrets—DTSA and IUTSA (Counts II and III)**

3M alleges that CDT and the Individual Defendants misappropriated 3M's trade secrets in violation of the Defend Trade Secrets Act (DTSA) (Count II) and the Indiana Uniform Trade Secrets Act (IUTSA) (Count III). The IUTSA governs actions for misappropriation of trade secrets under Indiana law and defines a "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

[25] The claim in Count I for tortious interference with contract is based on Christy and Wesner allegedly interfering with *Orozco*'s 3M Employee Agreement. This claim is not based on the allegations in Count V that Christy and Wesner violated Section 1(F)(9) of their *own* 3M Employee Agreements, which prohibits encouraging "any individual employed by 3M to terminate or leave the employment of 3M."

Ind. Code § 24-2-3-2; *see* Ind. Code §§ 24-2-3-3, 24-2-3-4; *Think Tank Software Dev. Corp. v. Chester, Inc.*, 30 N.E.3d 738, 744 (Ind. Ct. App. 2015), cited in *Cirrus ABS Corp. v. Strategic Am., Inc.*, No. 1:24-CV-251, 2024 WL 4554021, at *2 (N.D. Ind. Oct. 22, 2024). The DTSA, which defines "trade secret" in similar terms, authorizes "[a]n owner of a trade secret that is misappropriated" to bring a civil action. 18 U.S.C. §§ 1836(b), 1839(3).

The Defendants move for summary judgment solely on the basis that 3M has failed to identify with specificity the trade secrets that are the subject of these claims. "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of proving that they exist." *Zemco Mfg., Inc.*, 759 N.E.2d at 245–46 (citing *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 920 (Ind. 1993)); *see IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."); *NEXT Payment Solutions, Inc. v. CLEAResult Consulting, Inc.*, No. 1:17-CV-8829, 2020 WL 2836778, at *10 (N.D. Ill. May 31, 2020) (citing *IDX Sys.*, 285 F.3d at 584).

In their opening brief, the Defendants contend that 3M has only identified its trade secrets by describing generally what the alleged trade secrets do rather than specifically what they are. In support, the Defendants point to 3M's Rule 30(b)(6) deposition testimony, pages 11 and 12 of 3M's expert Philip Green's report, and portions of Green's deposition, which the Defendants correctly note set forth general categories of trade secrets and the definition of Confidential Information in the 3M Employee Agreements without identifying any trade secrets with the necessary specificity to survive summary judgment. In response, however, 3M does not rely on that evidence. Instead, 3M identifies the specific trade secrets "at-issue" in this litigation through the declaration of James McGinnis, 3M's Operations Manager for the Royersford, Pennsylvania,

facility that manufactures the superabrasives at issue in this case. *See* Resp. 24–25, ECF Nos. 111/125; SOAF ¶¶ 139–171, ECF Nos. 112/128, pp. 49–62.[26]

In his declaration, McGinnis identifies the following categories of 3M trade secrets: (1) 3M superabrasive product designs, specifications, and formulas; (2) 3M superabrasive testing/validation processes and results; (3) 3M superabrasive contractor information; (4) 3M superabrasive OEM and sales representative information; (5) 3M superabrasive key customer information; (6) 3M superabrasive technical drawings; (7) 3M superabrasive trade secret pricing information; (8) 3M forward-looking business plans and forecasts for superabrasives business; and (9) compilations of the above. McGinnis Decl. 6–17. Alone, these general categories are insufficient to meet 3M's burden.

However, McGinnis then provides a more specific description of each and—for trade secrets (1) through (7)—specific "at-issue" trade secrets, which 3M lists in its Statement of Additional Material Facts ¶¶ 139–171, providing additional examples in some instances. *See supra* Material Facts, Part E. In response to those specifically identified trade secrets, the Defendants largely offer only their objection to 3M's reliance on McGinnis' declaration, which the Court overruled above. *See* Resp. SOAF ¶¶ 135–171, ECF No. 146, pp. 24–43. Importantly, the Defendants do not argue that 3M's Statement of Additional Material Facts ¶¶ 139–171 fail to

---

[26] 3M also responds that it identified trade secrets during discovery in pages 13–20 of Green's expert report and in 3M's interrogatory responses. *See* Resp. 18–21, ECF Nos. 111/125. But the burden on summary judgment is to produce that evidence to the Court. Except for one "wheel drawing" that Green reproduced in his report, the cited pages contain only Green's *descriptions* of numerous alleged trade secrets. *See* Ex. 1, pp. 13–20, ECF Nos. 113-1/122. 3M does not identify in the record any of the evidence relied on by Green, and 3M did not include these excerpts from Green's expert report in its Statement of Additional Material Facts. The interrogatory responses filed in evidence contain only general categories of "highly confidential testing information on 3M grinding wheels" and computer assisted design (CAD) drawings. *See* Resp. Br. 20, ECF Nos. 111/125; Ex. 133, First Set of Interr. Resp. Nos. 2, 3, 17, ECF Nos. 120-13/121-38. While 3M's interrogatory responses list over 900 Bates stamp pages of evidence of "Confidential Information" and 165 pages for the "CAD drawings," 3M does not identify any specific information or drawing in its response brief or interrogatory responses as a trade secret.

identify the at-issue trade secrets with sufficient specificity. Thus, to the extent the identification of those alleged at-issue trade secrets is supported by the evidence of record as set forth in the Material Facts Section above, which the Court does not repeat here, 3M has identified trade secrets (1) through (7) with sufficient specificity to survive summary judgment but has not identified trade secrets (8) and (9) with sufficient specificity. *See supra* Material Facts, Part E.

Accordingly, the Court grants in part and denies in part the motion for summary judgment on the misappropriation of trade secrets claims in Counts II and III as to the trade secrets 3M has identified with sufficient specificity as set forth above in the Material Facts, Part E. As a result, the Court does not reach 3M's other arguments. Importantly, this is not a ruling as to whether the identified trade secrets meet the statutory definitions of a trade secret or were misappropriated by any of the Defendants.

## C.    Unfair Competition (Count IV)

Under Indiana law, unfair competition is a "subspecies of the class of torts known as tortious interference with business or contractual relations" recognized "for the protection of commercial values." *Biomet 3i, LLC v. Land*, No. 1:16-CV-125, 2017 WL 1483461, *11–12 (N.D. Ind. Jan. 10, 2017) (citing *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1064 (S.D. Ind. 2011); *Woodward Ins. v. White*, 437 N.E.2d 59, 67 (Ind. 1982); *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001)), adopted by 2017 WL 1483469 (N.D. Ind. Feb. 27, 2018). The tort includes "acts that although . . . generally considered a fair and welcomed part of vibrant competition, are engaged in for the primary purpose of destroying a competing business." *CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1064 (S.D. Ind. 2010) (cleaned up); *see Genesys Telecomms. Lab'ys, Inc. v. Morales*, No. 1:19-CV-695, 2019 WL 5722225, at

*16 (S.D. Ind. Nov. 5, 2019) (quoting *The Finish Line, Inc. v. Foot Locker, Inc.*, No. 1:04-CV-877, 2006 WL 146633, at *9 (S.D. Ind. Jan. 18, 2006)).

Count IV of the Amended Complaint alleges a claim of unfair competition based on a theory of improper employee raiding or poaching when CDT allegedly recruited and hired 3M employees to use their specialized and confidential knowledge about 3M's customers, costs and materials, and suppliers to give CDT an unfair advantage in developing and selling its superabrasives product lines to 3M's detriment. In their motion for summary judgment, the Defendants argue that this claim is nothing more than a repackaging of Count I's tortious interference with contract claim. Because 3M's response offers no analysis in support of this claim and does not address the argument that the claim is duplicative of Count I, the Court finds that 3M has abandoned this unfair competition claim based on employee raiding and grants summary judgment for the Defendants. *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (concluding that a claim was abandoned when the party failed to defend it "in his district court brief in opposition to summary judgment"). The Court also finds that the factual underpinnings of the claim are co-extensive with those of Count I that have survived summary judgment.

However, in its response brief, 3M asserts a new claim of unfair competition based on CDT passing off 3M's product as its own.[27] "Indiana courts have created a cause of action for unfair competition, defined as 'the attempt to create confusion concerning the source of the unfair competitor's goods.'" *Felsher*, 755 N.E.2d at 598 (citing cases). The tort "is premised upon the rationale that a person who has built up good will and reputation for his business is

---

[27] The Court construes 3M's assertion of this claim for the first time in its response brief as a constructive motion to amend. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023) ("[D]istrict courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's [summary judgment response brief] as a constructive motion to amend.").

entitled to receive the benefits from his labors. [Indiana] courts have held that such an interest is a property right deserving judicial protection." *Hammons Mobil Homes, Inc. v. Laser Mobile Home Transp., Inc.*, 501 N.E.2d 458, 460–61 (Ind. Ct. App. 1986) (citing *Hartzler v. Goshen Churn and Ladder Co.*, 104 N.E. 34, 37 (1914)). 3M offers two pieces of evidence to show that CDT is passing off 3M's goods as its own, only the second of which supports the claim.

    First, 3M asserts that CDT was passing off a 3M engineering drawing by covering up 3M's name with yellow sticky notes, citing Exhibit 91. The first page of the exhibit is a September 9, 2021 email from Keene to Wirth, both at CDT, stating, "Here is the Agathon wheel drawing you requested in order to generate quotation. Remember, we want to quote metal bond to compete against 3M and ATI." The second page is a technical drawing with yellow rectangles over the part of the page where the company name and confidentiality information is located. However, 3M offers no evidence to substantiate its assertion that it is a *3M* drawing, such as the full, original drawing, which 3M would presumably have in its possession. In contrast, the Defendants cite Keene's testimony that it was *not* a 3M drawing based on the font and that it could be any company's drawing, listing several possibilities. And as argued by the Defendants, 3M has not offered any evidence that this alleged passing off was made to the public, as the email was from one CDT employee to another and there is no further evidence about Wirth making a quotation. *See Hammons Mobil Homes*, 501 N.E.2d at 461 ("Unfair competition consists in passing off or attempting to pass off, *upon the public*, the goods or business of one person as and for the goods or business of another." (emphasis added) (cleaned up)).

    Second, 3M contends that, in 2021, while at CDT, Christy used 3M's confidential drawing of its 3M ASSM, MK2 cantilever spindle to have a superabrasives contractor copy it so CDT could offer the spindle to the market as its own design. As discussed in detail above in the

Material Facts and Count I, 3M has offered sufficient evidence to support this assertion regarding Christy's actions and that the CDT spindle was offered to at least three customers.

Thus, the Court grants in part and denies in part the motion summary judgment on Count IV. The Court grants summary judgment for all Defendants on the unfair competition claim based on employee raiding as abandoned by 3M.[28] On the claim of unfair competition based on passing off, the Court grants summary judgment for the Defendants on the claim based on Wesner's email with the unidentified attachment and denies summary judgment on the claim against CDT and Christy related to the 3M ASSM, MK2 cantilever spindle drawing.

### D.    Count V Breach of Contract—Chad Wesner and Solicitation of 3M Clients

In Count V, 3M alleges that one way each Individual Defendant breached 3M's Employee Agreement was by soliciting his former 3M accounts on behalf of CDT. Defendant Wesner moves for summary judgment on this claim that he allegedly solicited his former 3M customers at CDT in violation of § 3(F)(2)(b) of the 3M Employee Agreement. That provision prohibits the solicitation of 3M customers called upon during the former employee's last three years of employment by 3M. *See supra* Material Facts, Part B.

Under Indiana law, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021). On the element of breach, Wesner argues that 3M has no evidence that he solicited for CDT any of his 3M customers in violation of the 3M Employee Agreement. Wesner notes that, when asked if Wesner had called on a customer in violation of the Employee Agreement, 3M's Rule 30(b)(6) witness testified that Wesner was at "Engicom or Dana in

---

[28] Because 3M abandoned its claim of unfair competition based on corporate raiding, the Court does not reach CDT's argument that the claim on that basis is preempted by the IUTSA. In its reply brief, CDT does not argue that 3M's claim of unfair competition based on passing off is preempted.

Mexico." But when asked if Wesner had called on Engicom in the last three years of his employment with 3M, the Rule 30(b)(6) witness testified, "Not that I know of, no."

In a three-sentence response and without citation to any evidence, 3M contends only that "Wesner admitted to working with 3M's 'largest growth account' prior to his departure and then called upon that same company on behalf of CDT." Resp. 16, ECF Nos. 111/125. This appears to be a reference to 3M's response to the Defendants' SOF ¶ 73. *See* ECF Nos. 112/128. As discussed in the context of Count I, the evidence of record shows that the "largest growth account" was Eaton, that Wesner last serviced Eaton in 2018, and that Wesner did not service Eaton from 2019 through 2021. 3M has not created a dispute of material fact that Wesner serviced Eaton in the last three years of his employment with 3M.

3M does not cite any other evidence in this section of its response brief and thus has waived any argument that Wesner serviced other customers in violation of the 3M Employee Agreement. *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). The Court recognizes its ruling on Count I above that 3M has not offered evidence to create a dispute of fact that Wesner called on his former 3M customers Ford Livonia, Linamar, Tremec, Chrysler Kokomo, or Engicom. Accordingly, the Court grants summary judgment for Defendant Chad Wesner on the breach of contract claim in Count V based on soliciting his former 3M customers in violation of the 3M Employee Agreement.

**CONCLUSION**

For the reasons above, the Court hereby GRANTS in part and DENIES in part the Defendants' Motion for Partial Summary Judgment [ECF No. 94] as follows.

The Court GRANTS summary judgment for

(1) Defendant CDT on Count I brought by Plaintiff 3M Company as to the claim of tortious interference with the 3M Employee Agreements of all Former Employees *except* Former Employees Paul Christy and Timothy Keene;

(2) Individual Defendants Paul Christy and Chad Wesner on Count I brought by Plaintiff 3M Company;

(3) all Defendants on Count I brought by Plaintiff 3M Innovative Properties Company;

(4) all Defendants on Counts II and III only as to the trade secret misappropriation claims based on trade secrets (8) and (9) in as discussed in Material Facts, Part E;

(5) all Defendants on Count IV as to the claim of unfair competition based on employee raiding and based on passing off related to Wesner's email; and

(6) Defendant Chad Wesner on the claim within Count V that he breached his 3M Employee Agreement by soliciting his former 3M customers on behalf of CDT.

The Court DENIES summary judgment on

(1) Count I by Plaintiff 3M Company against Defendant CDT as to the claim of tortious interference with the 3M Employee Agreements of Former Employees Paul Christy and Timothy Keene;

(2) Counts II and III on the trade secret misappropriation claims against all Defendants as to trade secrets (1) through (7) recognized in Material Facts, Part E; and

(3) Count IV on the unfair competition claim against Defendant CDT and Individual Defendant Paul Christy based on passing off related to the 3M ASSM, MK2 cantilever spindle drawing.

Thus, the case remains pending on

(1) Count I by Plaintiff 3M Company for tortious interference with contract against
    (a) Defendant CDT as to interference with the 3M Employee Agreements of 3M Former Employees Paul Christy and Timothy Keene and
    (b) Individual Defendant Timothy Keene;

(2) Count II by Plaintiffs 3M Company and 3M Innovative Properties Company against all Defendants for violations of the DTSA on trade secrets (1) through (7) recognized in Material Facts, Part E;

(3) Count III by Plaintiffs 3M Company and 3M Innovative Properties Company against all Defendants for violations of the IUTSA on trade secrets (1) through (7) recognized in Material Facts, Part E;

(4) Count IV by Plaintiffs 3M Company and 3M Innovative Properties Company against Defendant CDT and Individual Defendant Paul Christy on the unfair competition claim based on passing off related to the 3M ASSM, MK2 cantilever spindle drawing;

(5) Count V by Plaintiffs 3M Company and 3M Innovative Properties Company
for breach of contract against
(a) Individual Defendants Paul Christy and Timothy Keene and
(b) Individual Defendant Chad Wesner as alleged except not for soliciting
his former 3M clients.

Pursuant to 28 U.S.C. § 636, this case is REFERRED to the Magistrate Judge in the Fort

Wayne Division for purposes of holding a settlement conference.

SO ORDERED on June 20, 2025.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT